**UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JANE DOE, | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | C.A. No. 19-cv-00100-WES-PAS |
| | : | |
| BROWN UNIVERSITY, | : | **REDACTED VERSION** |
| *Defendant*. | : | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM OF LAW**

**I.    INTRODUCTION**

Jane Doe was dismissed from Brown's Warren Alpert Medical School ("AMS") because she **lied** to an instructor and admitted to a life-long "pattern of *lying*," and was otherwise unable, in Brown's academic judgment, to fulfill the AMS's professionalism standards required to become a medical doctor who can safely treat patients – a core requirement of the AMS curriculum.  In this disability discrimination lawsuit, Doe is asking this Court to overrule and ignore (i) the considered judgment of a large committee of medical doctors that met on three separate occasions to consider Doe's dismissal, each time concluding that Doe should be dismissed, (ii) the judgment of other doctors and AMS staff who reported Doe's unprofessional conduct, and (iii) the judgment of the Dean of the AMS, who met with Doe and considered all of the documentation and evidence she submitted before affirming her dismissal.  Incapable of showing any real insight into or responsibility for her past conduct – both essential skills required of a medical doctor – Doe asks this Court to disregard decades of jurisprudence requiring judicial deference to academic judgment and force Brown to give its stamp of approval to a former student that, in its judgment, is unfit to receive an AMS degree.

While at the AMS, Doe received a litany of professionalism reports for her

unprofessional conduct, some of which – including chronic tardiness, absences from mandatory events with no advance notice, and failing to dress and conduct herself in an appropriate manner for a medical student – occurred repeatedly despite warnings that a failure to correct her conduct could have severe consequences. While Brown afforded Doe many opportunities to correct her unprofessional behavior, Doe's final professionalism report involved her missing an exam, *lying* to her professor about why she missed it, then admitting to lying only after it became impossible for her to maintain the lie. Incredibly, Brown recently learned (through a late production of text messages from Doe) that on the same day Doe missed her exam and lied to her professor regarding why she missed it – with Doe later claiming she ████████████████████ ████████████████████████████████████████████████████████ ██████████████████ – Doe, *during the time she was to take the exam, texted* ████████ *to ask:* *"Also: any interest in going to trivia tonight in boston with* ████████████ *etc.?" followed* *later by "Yo any chance you can drive me to the train station at 5:30 if its still raining at that* *time? … if not I can walk."* Again, this occurred the same day she lied to her professor about why she missed her exam, falsely claiming she was ████████████, when in fact she was planning to go to Boston for a trivia night.

When she finally admitted to lying, Doe also admitted that she had a life-long "pattern" of lying but passed off her dishonesty as a meaningless "white lie," a view she still holds to this day. The AMS's Medical Committee on Academic Standards and Professionalism ("MCASP") – which, under the AMS Student Handbook, has the discretion and authority to decide whether students advance in the AMS program – rightly found, in its academic judgment, that Doe's dishonesty would pose a risk to future patients and, equally important, that her unprofessional conduct did not meet the AMS's academic and technical standards, and dismissed her from the

AMS program.  The Dean of the AMS concurred with the MCASP's judgment.  Under settled law, that academic determination is entitled to substantial judicial deference.

Notwithstanding that █████████████████████████████████████████ ███████████████████████████████████████████, Doe claims that Brown dismissed her because of a disability and did not make reasonable accommodations.  But while the record is replete with evidence of Doe's dishonesty and lack of professionalism, there is ***no evidence*** that Brown either denied Doe an accommodation or acted with discriminatory intent, or that it did not have a good-faith belief of the numerous reports of Doe's unprofessional behavior.  She never requested a prospective accommodation to allow her to lie to a member of the AMS faculty.  And as Doe herself admitted at her deposition, Brown agreed to the accommodations Doe sought.  It was only after Doe's dismissal that she first sought to take an immediate leave of absence.  The undisputed record shows that Brown at all times acted reasonably and in accordance with the AMS Student Handbook.[1]

Doe brings the following claims: Disability discrimination and failure to accommodate under Title III of the Americans with Disabilities Act ("ADA") (**Count I**), Section 504 of the Rehabilitation Act (**Count II**), and the Rhode Island Civil Rights Act (**Count III**); intentional infliction of emotional distress (**Count IV**); and breach of contract (**Count V**) and of the covenant of good faith and fair dealing (**Count VI**) based on the AMS Student Handbook and Brown's Discrimination and Harassment Policy.  As the material facts are not in dispute, and drawing all inferences in Doe's favor, summary judgment should enter for Brown on Doe's claims for the following reasons:

---

[1] As explained below, even if Doe had not incurred her many other reports of unprofessional behavior, the final incident involving her lying and admitting to a life-long "pattern" of lying, standing alone, justified the MCASP's decision to dismiss her from the AMS.  And when that incident is coupled with her other professionalism reports, the MCASP was indisputably justified in dismissing her.

- **<u>Counts I, II, and III – Discrimination Under the ADA, Rehabilitation Act, and RICRA</u>**:  The undisputed evidence shows that Doe was dismissed due to her unprofessionalism, and there is ***no evidence*** that Brown dismissed Doe due to a disability.  Doe incurred six separate professionalism reports for a litany of unprofessional conduct.  While Brown could have taken more severe action earlier on against Doe, it instead repeatedly gave her opportunities to cure her unprofessionalism, but she failed to do so.  Despite this, Brown allowed Doe to remain in the AMS program until her final professionalism report, when she missed a self-scheduled exam, ***lied*** to her professor about why she missed it, admitted her lie only after she could no longer maintain it, and confessed to a "pattern" of lying.  The MCASP, which has the discretion and authority to determine whether AMS students have fulfilled the AMS program's academic requirements, found this incident to be particularly egregious and unanimously voted to dismiss Doe and, after she appealed, the MCASP and the Dean of the AMS affirmed her dismissal.  With no evidence that Brown acted based on Doe's disability and instead reached a reasoned academic judgment that Doe failed to fulfill the AMS program's academic requirements based on its good-faith belief in the reports of her unprofessionalism, summary judgment should enter for Brown.

- **<u>Counts I, II, and III – Failure to Accommodate Under the ADA, Rehabilitation Act, and RICRA</u>**:  The undisputed facts show that Doe first requested an accommodation on May 17, 2018, ***after*** Doe incurred all but her last professionalism report, and Brown ***granted Doe the accommodation she sought*** – taking a year off starting in October or November 2018.  But after receiving her requested accommodation, Doe incurred her final professionalism report for missing her test and lying, after which the MCASP voted to dismiss her.  It was ***not until Doe appealed her dismissal*** that she asked, for the first time, to take a year off starting immediately.  At that point, under settled law, it was too late.  As Doe was never denied a timely-requested accommodation, she cannot prevail on her failure to accommodate claims.

- **<u>Count IV – Intentional Infliction of Emotional Distress</u>**:  Brown's conduct that is the basis for Doe's intentional infliction of emotional distress claim – namely, dismissing her from the AMS, failing to provide reasonable accommodations, questioning her about her lying, asking if she was involved with drugs, and a comment purportedly made by her surgery rotation orientation leader – simply does not rise to the requisite level of extreme, outrageous, and atrocious conduct that is utterly intolerable in a civilized society.

- **<u>Counts V and VI – Breach of Contract and of the Covenant of Good Faith and Fair Dealing</u>**:  Doe's claim that Brown breached its Discrimination and Harassment Policy fails because that Policy merely restates Brown's pre-existing legal obligation not to violate discrimination laws and cannot form the basis of an enforceable contract, and to the extent Doe relies on other statements in the Policy, they are statements of aspiration and intent that cannot create a contract.  Doe's claim that Brown breached its Student Handbook fails because the undisputed facts show that Brown reasonably interpreted and followed the Student Handbook when it warned and, ultimately, dismissed Doe.

4

## II.    SUMMARY JUDGMENT LEGAL STANDARD

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Doe v. Brown Univ.*, 209 F. Supp. 3d 460, 471 (D.R.I. 2016).  This Court has observed:

> In evaluating a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor.  To defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party.  This evidence cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve at an ensuing trial.

*Doe v. Brown Univ.*, 209 F. Supp. 3d at 471 (citations and internal quotation marks omitted).  "A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  *Taylor v. Nat'l Invs., Ltd.*, 2022 U.S. Dist. LEXIS 18662, *8 (D.R.I. Feb. 2, 2022) (Smith, J.) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  As shown below, Doe cannot point to competent evidence that overcomes the undisputed facts showing that Brown (1) did not discriminate against or deny Doe an accommodation, (2) did not inflict legally-cognizable emotional distress on Doe, and (3) did not breach the Student Handbook or Discrimination and Harassment Policy.

## III.    LEGAL ARGUMENT

Brown's decision to dismiss Doe from the AMS was a purely academic decision, made in accordance with the academic policies described in the 2017-2018 and 2018-2019 editions of the Student Handbook, which apply here as the versions in effect when Brown warned (2017-2018) and dismissed (2018-2019) Doe.  Those academic policies state in plain and unambiguous language that professionalism, good judgment, and integrity are essential academic components of the AMS curriculum, on par with medical students' performance on exams.  The 2017-2018

Student Handbook provides that professionalism issues may be reported through a Professionalism Reporting Form ("PRF"), an OASIS evaluation, or "another evaluation that indicates unprofessional behavior"; both the 2017-2018 and 2018-2019 Student Handbooks further provide that multiple professionalism reports constitute a "pattern" and will subject a student to consideration by the MCASP for a Professionalism Warning; and that a professionalism issue that is, in the MCASP's judgment, "particularly egregious," is grounds for the MCASP, again in its judgment, to dismiss the student from the AMS. That is precisely what occurred here. See Statement of Facts ("SOF") ¶¶ 12, 14.

Before showing why, on the merits, summary judgment should enter for Brown on Doe's discrimination and accommodation claims, Brown first establishes that (1) professionalism, good judgment, and integrity are key *academic* components of the AMS curriculum, (2) Brown's decisions regarding Doe's academic qualifications are entitled to judicial deference, and (3) Brown was authorized, under the 2017-2018 Student Handbook, to consider all reports of Doe's unprofessionalism, and it followed the 2018-2019 Student Handbook when it dismissed Doe, and at all times acted reasonably and complied with the Student Handbook's requirements.

**A. Under The Student Handbook, Professionalism, Good Judgment, And Integrity Are Essential Academic Requirements That The MCASP Is Authorized To Consider In Determining Whether An AMS Student Advances Or Is Dismissed**

Doe cannot dispute that professionalism is an essential *academic* requirement for all AMS students. The 2017-2018 edition of the Student Handbook establishes professionalism as an essential academic component of the AMS curriculum, similar in importance to a student's performance on exams. It begins by stating, in "**Section I: Introduction and Overview**," that "[t]he policies in this handbook represent an evolution of the practices" of the AMS "since its origin" in 1963, which

continue to evolve along with the medical education curriculum. ***Our intention is***

6

> *that they reflect our commitment to* excellence and ***professionalism, for which we strive throughout our medical education program***.

SOF ¶ 8 (emphasis added).[2]  It also includes a section titled "**Medical Student Standards of Behavior**" that stresses, among other things, the importance of professionalism as a key component of the AMS curriculum:

> ***Medical students acquire skills and knowledge*** not only for their own benefit but also ***for the benefit of another party – their patients***.  The duty to act in the best interest of the patient is ***the fundamental ethical principle*** of the medical profession.  ***This duty dictates certain standards of professional behavior for medical students*** (and physicians) which include, but are not limited to, the following:
>
> …
>
> **Professionalism.**  ***As future physicians responsible for the well-being of patients, medical students are held to very high standards of professional behavior***.  The professional behavior expected of medical students includes, but is not limited to, fulfilling all academic and extra-curricular commitments, ***responding to communications from AMS faculty and staff in a timely manner, [and] notifying the appropriate personnel about anticipated absences within a reasonable time frame***[.]

SOF ¶ 11.  Indeed, the name of the entity charged with determining whether AMS students advance in the AMS program – the MCASP, or Medical Committee on Academic Standing ***and Professionalism*** – further emphasizes the essential importance of professionalism in the AMS program.

The Student Handbook similarly makes indisputable that professionalism is an ***academic*** requirement of the AMS.  In a section titled "**Policies and Protocols on Academic Standing and Promotion,**" it addresses the factors that the MCASP may consider in deciding whether a student advances in the AMS program, and includes a subsection addressing "Academic Standing" (*i.e.*, grades), and one addressing "Professionalism."  SOF ¶¶ 9, 10.  It also notes:

---

[2] For the remainder of this Memorandum, all bold italicized emphasis is added unless otherwise noted; all other emphasis is in the original.

> … ***The MCASP is charged with the responsibility of reviewing the*** academic performance and ***professional behavior of all students*** in the medical school. ***On the basis of this review, the MCASP determines whether students are to be*** promoted, promoted with conditions, not promoted, ***placed on academic warning*** or probation, ***dismissed***….

> ***Students who are experiencing*** academic difficulty or ***issues with professionalism are reviewed by the MCASP*** when that difficulty has been identified.

SOF ¶ 9. Courts agree that professionalism is a key academic requirement of medical schools. *See, e.g., Mares v. Miami Valley Hosp.*, No. 3:20-cv-453, 2023 U.S. Dist. LEXIS 76855, at *29 (S.D. Ohio May 2, 2023) (quoting *Al-Dabagh v. Case W. Res. Univ.*, 777 F.3d 355, 359 (6th Cir. 2015) ("Professionalism has been a part of the doctor's role since at least ancient Greece")); *Bazzi v. Wayne State Univ.*, No. 21-cv-10642, 2023 U.S. Dist. LEXIS 326, at *24 (E.D. Mich. Jan. 3, 2023) ("Plaintiff's dismissal as a medical student for lack of professionalism is a failure to meet academic standards"); *Hajjar-Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 117-18 (D.D.C. 2014) ("courts have concluded that, *particularly for medical students*, professional comportment issues fall under the umbrella of deference to academic decisions") and cases cited; *Zimmeck v. Marshall Univ. Bd. of Governors*, 106 F. Supp. 3d 776, 781 (S.D.W.V. 2015) (where professionalism is a goal of medical school program and student handbook explains professionalism expectations, professionalism is "an essential aspect of eligibility for medical school"), *aff'd* 2015 U.S. App. LEXIS 21441 (4th Cir. Dec. 11, 2015). The Student Handbooks thus establish that professionalism is a critical ***academic*** component of the AMS program, and that the MCASP has the authority and discretion to determine whether, in its academic judgment, an AMS student's academic performance – including her professionalism – meets AMS standards or, as in Doe's case, is so deficient that dismissal is warranted.

The Student Handbook also establishes that AMS students must meet the AMS's "Technical Standards." Those technical standards require that AMS students possess, among

other things, "the intellectual physical and emotional capabilities necessary to undertake the full curriculum and to achieve the levels of competence required by the faculty," and further provide:

> A candidate for the MD degree *must* have abilities and skills in five varieties, including … behavioral and social….
>
> …
>
> 5.   Behavioral and Social Attributes:  A candidate *must possess the emotional health required for full utilization of his or her intellectual abilities, the exercise of good judgment, the prompt completion of all responsibilities attendant to diagnosis and care of patients, and the development of mature, sensitive, and effective relationships with patients*. ... Compassion, *integrity*, concern for others, interpersonal skills, interest, and motivation *are all personal qualities that are assessed during the* admission and *education processes*.

SOF ⁋ 12.  Like the AMS's professionalism requirements, the technical standards are an essential *academic* requirement of the AMS.  *See, e.g., Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 838-42 (6th Cir. 2018) (affirming summary judgment for medical school on student's ADA and Rehabilitation Act claims where student failed to satisfy school's "technical requirements" including "possess[ing] the emotional and mental health required for full utilization of [student's] abilities," and noting that decisions regarding technical standards are "academic decisions" entitled to judicial deference); *see also, e.g., Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.*, 749 F. App'x 776, 781-82 (11th Cir. 2018) (under ADA and Rehabilitation Act, medical student must prove she is "able to meet the academic and technical standards requisite to … participation in the education program"); *McCulley v. Univ. of Kan. Sch. of Med.*, No. 12-2587-JTM, 2013 U.S. Dist. LEXIS 156233, at *40 (D. Kan. Oct. 31, 2013) (technical standards are an integral and essential part of medical education).  The AMS's decisions regarding Doe's professionalism and her fulfillment of the AMS's Technical Requirements were *academic* decisions which, as explained below, are entitled to substantial judicial deference.

9

### B. Brown's Academic Decisions Are Entitled To Substantial Deference

It is well-settled that Brown's assessment of Doe's academic performance is entitled to substantial judicial deference. "Generally, academic decisions concerning grades, coursework, and progress within an academic program are accorded great deference and are not subject to judicial review." *Felkner v. R.I. Coll.*, 291 A.3d 1001, 1009-10 (R.I. 2023). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* "Furthermore, courts should show great respect for the faculty's professional judgment. Plainly, [courts] may not override [professional judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* (internal quotations omitted).

"[D]ismissing a medical student for lack of professionalism amounts to an academic judgment to which courts owe considerable deference." *Eid v. Wayne State Univ.*, No. 22-1458, 2023 U.S. App. LEXIS 6256, at *3 (6th Cir. Mar. 15, 2023) (citing *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355, 357, 359 (6th Cir. 2015) and *Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 300 (6th Cir. 2019)); *see Bazzi*, 2023 U.S. Dist. LEXIS 326, at *24; *see also Neal v. E. Carolina Univ.*, 53 F.4th 130, 145-46 (4th Cir. 2022) (great deference should be afforded to a school's determination on the professionalism of a graduate student). In cases involving academic suspension or dismissal, educational institutions "have the right to receive summary judgment ***unless there is evidence from which a jury could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance***." *Doe v. Washington Univ.*, 780 F. Supp. 628, 631 (E.D. Mo. 1991) (citing *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250 (8th Cir. 1985) and *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 98 (1978)); *see also Doe v. Loyola Univ. Chi.*, No. 18-cv-7335, 2022

10

U.S. Dist. LEXIS 175968, at *101 (N.D. Ill. Sep. 28, 2022).  The Supreme Court has cautioned that

> [w]hen judges are asked to review the substance of a genuinely academic decision . . . they should *show great respect for the faculty's professional judgment*. Plainly, *they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment*.

*Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *see also Horowitz*, 435 U.S. at 90, 96 n.6 (1978) ("University faculties *must* have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.").

In a case involving the University of Missouri's academic dismissal of a medical student, the Supreme Court explained the basis for affording universities such deference:

> The decision to dismiss respondent . . . rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress towards that goal…. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Horowitz*, 434 U.S. at 89-90; *see also Khan v. Midwestern Univ.*, 879 F.3d 838, 844 (7th Cir. 2018) (Rehabilitation Act case; citing *Horowitz* and noting "[a]cademic decisions, such as whether a student is qualified for, or entitled to promotion within a program, *must* be left to the broad discretion of the academic institution"); *Mbawe*, 751 F. App'x at 838-42 (medical school's decision regarding student's fulfillment of technical requirements is an academic decision entitled to deference); *Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1014 (E.D. Mich. 2017) (applying "appropriately deferential view" to medical school's decisions concerning student's performance under "technical standards and professionalism requirements").  Here, it is the

11

MCASP – comprised of AMS faculty members – that engaged in the "expert evaluation of cumulative information" provided by Doe's instructors and, only after affording her multiple opportunities to cure her many documented professionalism issues, determined that Doe should be dismissed.

Academic deference is routinely observed where, as here, a student alleges disability discrimination under the Rehabilitation Act and the ADA.[3]  Importantly, courts are particularly reluctant to second-guess academic decisions regarding program standards applicable to students in medical fields, since "the conferral of a degree places the school's imprimatur upon the individual as someone qualified to pursue a physician's license."  *Garcia v. State Univ. of N.Y.*, 2000 U.S. Dist. LEXIS 13561 at *30 (E.D.N.Y. Aug. 21, 2000) (citation omitted) *aff'd* 280 F. 3d 98 (2d Cir. 2001); *see also Hajjar-Nejad*, 37 F. Supp. 3d at 117-18 ("courts have concluded that, *particularly for medical students*, professional comportment issues fall under the umbrella of deference to academic decisions") and cases cited.  Accordingly, Brown's academic decisions concerning Doe are entitled to deference, and Brown should receive summary judgment on Doe's discrimination claims unless Doe offers competent evidence that Brown acted with impermissible discriminatory intent and "substantially departed from norms or failed to use professional judgment."  *Driscoll v. Bryant Univ.*, 393 F. Supp. 3d 153, 157 (D.R.I. 2019), citing *Ewing*, 474 U.S. at 225.

Here, evidence of Doe's subpar performance under the AMS's professionalism and technical standards is overwhelming and conclusively establishes that Doe consistently failed to fulfill the requirements of the AMS, which she knew would subject her to consequences up to

---

[3] *See DeAngelo v. Vanderbilt Univ.*, 821 F. App'x 471, 484 (6th Cir. 2020); *Power v. Univ. of N.D. Sch. of Law*, 954 F.3d 1047, 1053 (8th Cir. 2020); *Khan*, 879 F.3d at 844; *Mbawe*, 751 F. App'x at 838-42; *Campbell v. Lamar Ins. of Tech.*, 842 F.3d 375, 380-81 (5th Cir. 2016); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 463 (4th Cir. 2012); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 792 (1st Cir. 1992); *Driscoll v. Bryant Univ.*, 393 F. Supp. 3d 153, 157 (D.R.I. 2019).

and including dismissal.  Meanwhile, there is ***no evidence of discriminatory bias***.  Despite this, Doe asks that the Court second-guess the judgment of Brown and the MCASP (and, by extension, of Doe's AMS instructors who issued professionalism reports), all of whom had firsthand knowledge of Doe's academic abilities and were best positioned to assess whether she possessed the professionalism required to receive an AMS degree.  This Court, consistent with the cases cited above, should not second-guess their fair, informed, and correct dismissal decision.[4]

Having established that Doe's dismissal was an academic decision entitled to judicial deference, Brown next provides a timeline of Doe's unprofessionalism issues, and points to those portions of the Student Handbook relevant to Doe's claims.

### C.  A Timeline Of Doe's Unprofessionalism, And The Portions Of The 2017-2018 Student Handbook Relevant To Doe's Claims

It is undisputed that, while the first reports of Doe's professionalism deficiencies were issued during the 2015-2016 school year, the MCASP first considered Doe's professionalism issues and issued a formal warning during the 2017-2018 school year and dismissed her during the 2018-2019 school year.  The following is a timeline of Doe's professionalism issues and the MCASP record (all reports of Doe's unprofessional behavior that were considered by the MCASP are in bold italicized type, and further details concerning each are provided *infra*):

---

[4] Consistent with the policy underlying this deferential standard, Brown submits that it must be allowed to set and enforce its AMS program standards, as Brown is accountable to the public to ensure that AMS graduates have the skill and knowledge necessary to provide patients with competent and appropriate care.  To fulfill this critical goal – and to maintain public confidence that ***all*** those who hold an AMS degree are competent healthcare providers – Brown developed its reasonable AMS program performance standards, set out in the Student Handbook.  Although the MCASP displayed flexibility for Doe's benefit in applying those standards by repeatedly affording her opportunities to cure her unprofessional behavior, Doe simply could not meet the program's professionalism requirements, and it should be Brown – whose reputation is on the line with each AMS degree that it awards – that sets and determines whether students meet the AMS program's standards.

13

**Doe's First Year of Medical School (2015-2016 School Year):**

- September 2015: During her first year of medical school, Doe receives the following feedback concerning professionalism on an evaluation form: ███████████████ ████████████████████████████████████ SOF ¶ 19.

- November 2015: Doe receives the following feedback concerning professionalism on an evaluation form: ███████████████████ SOF ¶ 20.

- ***December 2015: Doe receives an evaluation for Doctoring I from the Small Group Leader that, in the section titled "Professionalism," notes that Doe's professionalism "requires remediation" and Doe should work to improve her professionalism by "striv[ing] to find the appropriate balance between*** ███████████████." SOF ¶ 21.

- January 2016: Doe is presented to the MCASP as a first-year student who ████████ ███████████████████████████ SOF ¶ 22.

**Doe's Second Year of Medical School (2016-2017 School Year):**

- ***October 2016: Doe receives an evaluation for Doctoring III that, in the section titled "Professionalism," includes concerns over professionalism:*** █████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ SOF ¶¶ 23, 24.

- December 2016: Doe receives feedback regarding an OSCE test for ███████████ ██████████████████████████████████ SOF ¶ 24.

- January 2017: The same doctor who issued the October 2016 evaluation for Doctoring III, described above, notes ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ SOF ¶ 25.

- February 2017: During her second year of medical school, Doe receives the following feedback concerning professionalism on an evaluation form: █████████████ ████████████████████████████████████

 [redacted] SOF ¶ 28.

- February 2017: Doe receives feedback regarding an OSCE test [redacted] SOF ¶ 29.

- February 2017: Doe receives an evaluation form with the following feedback concerning professionalism: [redacted] SOF ¶ 30.

**<u>Doe's Third Year of Medical School (2017-2018 School Year)</u>:**

- September 2017: During her third year of medical school, Doe receives feedback concerning professionalism on an evaluation form, [redacted] SOF ¶¶ 33, 34.

- ***November 1, 2017: Doe receives a PRF for a lengthy list of unprofessional conduct during orientation and pelvic and breast examination sessions including, among other things,*** [redacted] SOF ¶ 35.

- November 14, 2017: [redacted] SOF ¶ 44.

- November 22, 2017: The MCASP, after meeting on November 9, 2017 and reviewing Doe's documented instances of unprofessionalism, issues a letter to Doe with a Professionalism Warning. SOF ¶¶ 42, 45.

- December 2017, Doe receives an evaluation that states [redacted]

███████████████████████████████████████████████████████████████

██████████████████ SOF ¶ 47.

- ***January 24, 2018:  Doe receives a PRF for*** ███████████████████████████
  ████████████████████████████ ***for her VA Medicine Clerkship***.
  SOF ¶ 52.

- February 1, 2018:  Dean Allan Tunkel, MD, PhD, MACP, Senior Associate Dean for
  Medical Education at AMS, writes to Doe, █████████████████████████████
  ████████████████████████████████████ SOF ¶ 56.

- February 20, 2018:  After the February 15, 2018 MCASP meeting, Dean Tunkel writes to
  Doe, ████████████████████████████████████████████████████
  ██████████████████ SOF ¶ 61.

- February 27, 2018: ████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████ SOF ¶ 62.

- ***March 12, 2018:  Doe receives a PRF for multiple instances of unprofessional
  behavior during a different course, her Surgery Clerkship,*** ████████████████
  ████████████████ SOF ¶¶ 65, 66.

- March 15, 2018: ████████████████████████████████████████████
  ████████████████████████████████████████████ SOF ¶ 69.

- April 20, 2018: ████████████████████████████████████████████████
  ████████████████████████████████████████████████ SOF ¶
  74.

16

- May 1, 2018:  Doe misses a meeting with Dean Jordan White, MD, MPH, Assistant Dean for Student Affairs (AMS), Assistant Dean of Medicine (Program in Liberal Medical Education), Assistant Professor of Family Medicine and Medical Science, to discuss her unprofessional behavior, including her failure to attend mandatory events like this meeting.  SOF ¶ 76.

- ***May 3, 2018:  Doe receives a PRF for missing her meeting with Dean White, which meeting*** ███████████████████████████████████████ ███████████████████          SOF ¶ 79.

**2018-2019 School Year:**

- June 5, 2018:  Doe misses her self-scheduled OSCE exam, after which Doe lies to her professor, Steven Rougas, M.D., MS FACEP, Director, Doctoring Program at AMS, and Assistant Professor of Emergency Medicine, stating that she missed it because ██████ ████████████████████████████████████████  Dr. Rougas agrees to Doe's request to take the OSCE exam that Thursday, and also asks Doe to submit documentation regarding ████████████████  "so that we can submit this as an excused absence."  Later on June 5, ███████████  SOF ¶¶ 89-90, 95, 96.

- June 7, 2018:  Dr. Rougas, having not received for two days any of the promised documentation of Doe's claimed ████████████  again requests that Doe provide the documentation.  Doe responds by email, asking for an in-person meeting.  SOF ¶ 96.

- June 8, 2018:  Three days after telling Dr. Rougas that she missed the exam due to a ███████████████  and only after Dr. Rougas' second request for documentation of her purported ████████████, Doe admits to Dr. Rougas that she ***lied*** about the reason she missed her OSCE.  She further tells him that she has a "***pattern of lying*** … that she has fallen accustomed to doing."  SOF ¶¶ 97, 104.

- ***June 12, 2018:  Doe receives a PRF for missing the OSCE exam, and for lying to Dr. Rougas about why she missed it.***  SOF ¶ 104.

- June 13, 2018: Doe receives feedback regarding her OSCE exam, ███████████████ ████████████████████████████████████████████████████████ ██████████████████████████  SOF ¶ 110.

- June 14, 2018:  The MCASP, considering Doe's long history of professionalism reports, and finding that the June 12 incident was "particularly egregious," votes to dismiss Doe.  SOF ¶ 111.

- June 19, 2018:  Dean Tunkel sends Doe a letter formally notifying her that the MCASP had voted to dismiss her from the AMS.  SOF ¶ 115.

- June 22, 2018:  Doe appeals her dismissal, and AMS Dean Jack Elias, M.D., the Dean of

the Medical School, rather than simply affirm her dismissal, instead directs the MCASP to reconsider its dismissal decision in light of the additional information that Doe provided as part of her appeal.  SOF ¶¶ 116, 117.

- August 9, 2018:  After submitting additional documentation to the MCASP, Doe and her advocate attend and speak at the MCASP meeting to reconsider its dismissal decision. The MCASP votes to affirm its dismissal decision.  SOF ¶¶ 121-122, 124.

- September 6, 2018: Doe meets with Dean Elias and another dean regarding her appeal of her dismissal. SOF ¶ 127.

- September 13, 2018:  The MCASP meets and notes that Doe had met with Dean Elias the prior week, and that Dean Elias, before issuing a final decision on Doe's appeal, will meet with the MCASP.  SOF ¶ 128.

- September 20, 2018: The MCASP meets with Dean Elias to ██████████████████ ████████████████████████████████████████ ████████████████████  SOF ¶ 130.

- September 24, 2018:  Dean Elias affirms the MCASP's decision to dismiss Doe.  SOF ¶ 131.

Thus, while Doe's professionalism issues first surfaced in 2015 and 2016, the MCASP's first action taken against her – the November 22, 2017 Professionalism Warning – and all subsequent proceedings occurred during the 2017-2018 school year, and she was dismissed, and her dismissal affirmed, during the 2018-2019 school year.[5]

Importantly, under the 2017-2018 Student Handbook, the MCASP had both the authority and discretion to consider *all* written reports of Doe's professionalism issues, not just her PRFs, and to take action and, ultimately, dismiss Doe for her multiple professionalism infractions:

**Professionalism**

---

[5] While Doe was dismissed and appealed her dismissal during the 2018-2019 school year, and the 2018-2019 Student Handbook thus applies to those actions, the dismissal and appeal provisions of the 2018-2019 Student Handbook are substantively similar to those in the 2017-2018 Student Handbook, except that the 2018-2019 version adds that, in the event of an appeal, "[t]he Dean may, at their discretion, meet with the student regarding the appeal" before deciding whether to reconsider the matter, direct the MCASP to reconsider and issue a second recommendation, or sustain the MCASP's decision.  *See* 2018-2019 Student Handbook at 30.  Regardless, it is undisputed that Dean Elias met with Doe prior to deciding to affirm Doe's dismissal.  SOF ¶ 128.  Both editions of the Student Handbook state that, in the event of an appeal, "[t]he decision of the Dean is final."  SOF ¶ 126.

In general, the committee will adhere to the following guidelines for decisions related to issues of professionalism:

*Issues of professionalism can be documented in several ways: a brief reporting form (the "Professionalism Report Form")* that can be completed by individuals within the community (e.g., staff, faculty, residents, students); through an OASIS evaluation …; *or through another evaluation that indicates unprofessional behavior* (e.g., Doctoring evaluation by a community mentor).

…

*Two or more reports of unprofessional behavior will be considered a pattern* and will be brought to the attention of the Assistant Dean for Student Affairs and to the MCASP. …

*The MCASP will determine if the pattern of behavior warrants a "Professionalism Warning."* …

…

In certain circumstances, when the behavior in question is considered egregious in nature, either the MCASP or the Assistant Dean for Student Affairs, in discussion with the Associate Dean for Medical Education, may decide to bypass the Warning stage and issue a Professionalism Citation.  Per AAMC guidelines, the Citation will be included as part of the student's MSPE.

*If a student who has received a Professionalism Warning receives an additional Professionalism Report, that student will be considered by the MCASP for a Professionalism Citation that per AAMC guidelines will be included as part of the student's MSPE*.

*If a behavior is particularly egregious*, or if a student has received a Professionalism Citation and subsequently has another instance of unprofessional behavior, *the student will be considered by the MCASP for dismissal*.

SOF ¶¶ 13, 14.

The undisputed facts show that, when Doe received a Professionalism Warning on November 22, 2017, she had already received three separate professionalism reports that were considered by the MCASP: (1) the December 1, 2015 Doctoring I Student Evaluation noting that she needed "███████████████████████████;" (2) the October 2016 Doctoring III Mid-Term Evaluation noting two separate professionalism concerns; and (3) the November 1, 2017 PRF for multiple instances of unprofessional behavior.  Under the 2017-2018 Student Handbook,

the MCASP was entitled to consider all three of these reports, although two of them were not in the form of a PRF, because the 2017-2018 Student Handbook authorized the MCASP to consider **both** PRFs **and** reporting "through another evaluation that indicates unprofessional behavior." Confronted with these repeated reports of unprofessionalism – which, under the Student Handbook, "will be considered a pattern" of unprofessionalism – the MCASP was authorized to determine "if the pattern of behavior warrants a 'Professionalism Warning,'" which is precisely what occurred. The MCASP also followed the 2017-2018 and 2018-2019 Student Handbooks when, following Doe missing her OSCE exam and lying, the MCASP found the incident to be "particularly egregious" and dismissed her.[6]

The 2017-2018 Student Handbook also sets out the AMS's technical standards which AMS students "must" possess, including "the exercise of good judgment" and "integrity." SOF ¶ 12. The AMS's technical standards further require that students "must be able … to function effectively under stress." *Id.* As with professionalism, fulfillment of these technical standards is essential, as the technical requirements "are requirements for admission, promotion, and graduation" from the AMS. *Id.*

With all this in mind, Brown next shows why, on the merits, summary judgment should enter for Brown on Doe's discrimination and failure to accommodate claims.

---

[6] Doe wrongly suggests in her Complaint that the 2016-2017 Student Handbook applies to her claim, as she alleges that "Brown's policies" provide that the MCASP could issue a Professionalism Warning only after the student received two **PRFs**. Cmpl. ¶ 32. As the timeline of her MCASP record shows, it was during the 2017-2018 school year that the MCASP first considered Doe's professionalism issues and warned her, and during the 2018-2019 school year that the MCASP dismissed Doe and, after appeal, affirmed Doe's dismissal. On these facts, it is the 2017-2018 Student Handbook – which authorized the MCASP to consider not only Doe's PRFs, but also any other "evaluation that indicates professional behavior" – that applies to the MCASP's actions during that time, and the 2018-2019 Student Handbook that applies to her dismissal and appeal.

**D.  Doe's Claims Of Discrimination And Failure To Accommodate Under The ADA, Rehabilitation Act, And Rhode Island Civil Rights Act Fail As A Matter of Law.**

Counts I and II of Doe's Complaint are claims for disability discrimination and failure to accommodate under the ADA and Section 504 of the Rehabilitation Act, respectively.  Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  *See generally* 42 U.S.C. § 12182(a).

The Rehabilitation Act similarly protects individuals against discrimination based on a disability, but unlike Title III of the ADA, the Rehabilitation Act only applies to federal programs and programs receiving federal funds.  It provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  *See* 29 U.S.C. § 794(a).  Claims brought under Title III of the ADA and Section 504 of the Rehabilitation Act are subject to identical requirements.  *See, e.g., Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 152 n.13 (1st Cir. 1998) and cases cited.

Count III of Doe's Complaint is a claim for disability discrimination under the Rhode Island Civil Rights Act, R.I. Gen. Laws §§ 42-112-1 *et seq.* ("RICRA") and is subject to the same requirements as her ADA and Rehabilitation Act claims.  *See DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 25 (R.I. 2005).[7]

The Supreme Court endorses the three-step *McDonnell Douglas* test to establish a violation of federal antidiscrimination law.  *See Trahan v. Wayfair Me., LLC*, 957 F.3d 54, 60-61

---

[7] Brown agrees it is subject to the cited provisions of the ADA, the Rehabilitation Act, and the RICRA.

(1st Cir. 2020),[8] *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Plaintiff bears the initial burden of producing evidence to establish a *prima facie* case, after which the burden of production shifts to the defendant to articulate one or more non-discriminatory reasons for the allegedly discriminatory action.  *See id.*  Once the defendant satisfies its burden of production – which "is merely a burden of production; the burden of persuasion remains throughout with the [plaintiff]" – the burden of proof shifts to the plaintiff to provide evidence showing that the action complained of is merely pretext for behavior actually motivated by discrimination.  *See id.*  The *McDonnell Douglas* burden-shifting test is applicable in Rehabilitation Act, ADA, and RICRA claims.  *See id.*; *Shepherd v. U.S. Olympic Comm.,* 464 F. Supp. 2d 1072, 1089 – 1090 (D. Col. 2006); *El Kouni v. Trs. of Boston Univ.*, 169 F. Supp. 2d 1, 2-3 (D. Mass. 2001); *DeCamp*, 875 A.2d at 25.

As for Doe's disability discrimination claims, she must initially make a *prima facie* showing that: (1) she has a disability as defined by the statute,[9] (2) she is "otherwise qualified" for the benefit in question, and (3) the defendant discriminated against her as an individual with a disability.  *Driscoll*, 393 F. Supp. 3d at 159; *see also Khan*, 879 F.3d at 843 (describing third element to require plaintiff to show "she either was excluded from participating in, or denied the benefit of that program ***based on her disability***").  The same test applies to Doe's failure to accommodate claims, except that the third element requires a showing that Brown failed to make reasonable modifications that would accommodate Doe's disability without fundamentally altering the nature of the AMS program.  *See id.*; *Mershon v. St. Louis Univ.*, 442 F.3d 1069,

---

[8] While *Trahan* is an ADA case in the employment context, the legal requirements for ADA, Rehabilitation Act, and RICRA claims is the same in the educational context.  *See Doe v. Brown Univ.*, 2020 U.S. Dist. LEXIS 42188, *5 n.3 (D.R.I. Mar. 11, 2020) and cases cited.

[9] For purposes of this Motion only, Brown does not dispute that Doe is disabled as defined in the ADA, Rehabilitation Act, and RICRA.

1076 (8th Cir. 2006); *Doe v. Oklahoma City Univ.*, 406 F. App'x 248, 250-51 (10th Cir. 2010).

As shown below, Doe cannot make out a *prima facie* case on her disability discrimination or failure to accommodate claims because she cannot establish that (i) she was "otherwise qualified" academically with or without accommodation, (ii) Brown discriminated against her, or (iii) Brown failed to accommodate her disability.  And even if Doe could make out a *prima facie* case and satisfy the first step of the *McDonnell Douglas* burden-shifting test, Brown easily satisfies its burden of establishing a legitimate, non-discriminatory reason for her dismissal – Doe's failure to fulfill the AMS's professionalism and technical standards.

Finally, Doe cannot point to evidence that even suggests that Brown's non-discriminatory basis for her dismissal is a pretext and that Brown acted with discriminatory intent.  Instead, Brown acted based on the many documented instances of Doe's unprofessional conduct – instances that Brown believed in good-faith accurately described Doe's behavior and, acting on that information, ultimately decided to dismiss her from the AMS.  By acting on the documented record, it is clear that information – and not any purported discriminatory intent – was the basis for Doe's dismissal.  *See, e.g., Tavares v. Enter. Rent-A-Car Co. of R.I.*, 2016 U.S. Dist. LEXIS 164367, *58-59 (D.R.I. June 16, 2016 (Sullivan, MJ.) (report and recommendation noting, in context of employment discrimination and retaliation claims, that "the employee cannot show pretext by demonstrating that the employer's foundation for the decision to terminate was incorrect or unwise, as long as the employer believed its stated reason" (citation omitted)), *Report and Recommendation adopted by* 2016 U.S. Dist. LEXIS 164360 (Smith, J.); *see also, e.g.*, *Aslani v. Bd. of Trs. of the Univ. of Ill.*, No. 16-CV-10476, 2023 U.S. Dist. LEXIS 180692, at *16-17 (N.D. Ill. Oct. 6, 2023); *Richardson v. Lutheran Univ. Ass'n*, No. 2:14-CV-92-PRC, 2015 U.S. Dist. LEXIS 145231, at *20-21 (N.D. Ind. Oct. 26, 2015); *Fernandez-Ocasio v.*

23

*Walmart P.R. Inc.*, 94 F. Supp. 3d 160, 176-77 (D.P.R. 2015).  As a result, she cannot show that Brown dismissed her based on her disability.

## 1. Doe Is Not Otherwise Qualified To Meet The Requirements Of The AMS Program.

Doe cannot point to evidence that she was "otherwise qualified" to meet the essential academic requirements of the AMS program with or without reasonable accommodations. Indeed, there is substantial undisputed evidence that Doe was ***not*** academically qualified for the AMS program because she failed to fulfill its professionalism requirements and technical standards.

In discrimination cases involving colleges and universities, a person is "otherwise qualified" if she is able to meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation.  *Khan*, 879 F.3d at 844.  In such cases, "[t]he law does not require an academic program to compromise its integral criteria to accommodate a disabled individual."  *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 154 (1st Cir. 1998) (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 405 (1979)).  Nor should it, since the reputation of the AMS program rises and falls on the rigor of its performance standards, and Brown should be afforded the freedom to choose and enforce its own standards.  More important, as physicians are essential frontline healthcare providers, it should be Brown – with its knowledgeable and experienced AMS faculty and MCASP – that sets and enforces the standards to earn an AMS degree and fill this critical healthcare role.

### a. The Record Evidence Shows That Doe Was Dismissed Due To Her Poor Academic Performance, Not Because Of A Disability

To provide full context to the MCASP's actions, Brown describes in detail all of Doe's documented professionalism issues that the MCASP considered and ultimately led to her dismissal.  Doe's professionalism issues first surfaced in December 2015, when she received an

evaluation ████████████████████████████████████████████

████████████████████████████████████████████████ Less

than a year later, in October 2016, Doe received another evaluation that ███████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ .

On November 1, 2017, Doe received a PRF from Roxanne Vrees, MD, Assistant

Professor of Obstetrics and Gynecology at AMS, listing a litany of professionalism issues:



*See generally* SOF ¶¶ 19-35.  This PRF reflects not only repeated instances of unprofessional

conduct, but also shows that Doe had not corrected her ██████████████████████ .

She also ████████████████████████████████████████ .  SOF ¶

35.  In early November, AMS staff reviewed Doe's prior conduct regarding professionalism, and

Dr. White met with Doe on November 8, 2017.  SOF ¶¶ 36-41.

Following the PRF from Dr. Vrees, on November 9, 2017, the MCASP met and considered Doe for a Professionalism Warning. At that meeting, the MCASP considered, among other things, (1) Doe's December 2015 and October 2016 professionalism reports, (2) the fact that she was ███████████████████████████████████████████████ ███████████████████████████████████████[10] and (3) the litany of professionalism issues in her November 1, 2017 PRF.[11] SOF ¶ 42. The MCASP discussed ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████ and ultimately voted to issue the Professionalism Warning. Importantly, at that meeting, ████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ SOF ¶ 42. ███████ ██████████████████████ subsequent events demonstrated that Doe did not improve her professionalism despite the ongoing feedback.[12]

The MCASP's letter with the Professionalism Warning instructed Doe to write a letter to the Committee for its next meeting and to meet with Dr. White. SOF ¶ 46. Although Doe did submit a letter, she did not meet with Dr. White before the next MCASP meeting. SOF ¶¶ 48-

---

[10] █████████████████████████████████████████████████
SOF ¶ 31.

[11] The MCASP agenda for this November 9, 2017 meeting ████████████████ ██████████████████████████████████████████████████ ████████████████ SOF ¶ 124.

[12] Indeed, Doe received ongoing feedback from Brown personnel throughout her tenure at the AMS. *See, e.g.,* SOF ¶¶ 19-21, 23-25, 28-30, 32-36, 38-41, 43-53, 56-62, 65-68, 70-71, 90, 110.

52.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████  Nevertheless,

Doe continued to receive feedback about ████████████████████████████.

*See, e.g.*, SOF ¶¶ 62, 65, 76, 77, 143, 145.  Doe continued to ████████████████

████████████, a pattern that dated back to her undergraduate years at Brown.  SOF ¶¶ 56-58, 70.

Two months later, in late January 2018, Doe received another PRF for ████████

█████████ for her VA Medicine clerkship.  Attached to that PRF are two strings of emails

between Doe and hospital personnel, including Jordan Grimes, AMSA, Medical Services,

Providence VA Medical Center.  The first string was exchanged between December 11, 2017

and January 10, 2018.  On December 11, 2017, Mr. Grimes emailed Doe to ████████████

████████████████████████████████████████████████

█████████████████████  Having ████████████, Mr. Grimes on January 3, 2018

again asked Doe to ██████████████████████████████████

█████████████, prompting him to again email on January 9 to ██████████████

█████████"  Doe ███████████████████████████████████████

██████████████████████████████████████.  These emails reflect

Doe's ████████████████████████████████.  SOF ¶ 52.

The second email string, titled "URGENT: TMS Modules," was exchanged between

January 9 and 25, 2018.  On January 9, Mr. Grimes emailed Doe (and at least one other AMS

student),[13] stating that █████████████████████████████████████

██████████████████████████████████████████████

---

[13] It is undisputed that ████████████████████████████████████████████.
SOF ¶ 52.

████████ [.]" Mr. Grimes emailed again on January 10, sending ████████████████

███████████████████████████████████. Despite ████████████████

██████████████████████, Mr. Grimes emailed Doe on January 23, confirming that

█████████████████████████████████████████████████████

████████." Doe finally ██████████████████████████████████████

████████████████████████████. SOF ¶ 52.

Similar issues continued to arise, despite repeated and specific ongoing feedback. For example, on February 27, 2018, the doctor who filed the November 1, 2017 PRF and then met with Doe to discuss it, submitted a summary performance evaluation stating that ███████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████. SOF ¶ 63.

The next month, in mid-March 2018, Doe was issued yet another PRF that again cited her

█████████████████████████████████████████ [14] for which "no improvement was made during

rotation," and "████████████████████████████████████████████████

███████████████████████████████████." Doe also

engaged in "██████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████." The reviewer "encourage[d] her to work on

███████████████████████." SOF ¶¶ 65, 66.

Less than two months later, in early May 2018, Doe received a PRF for ██████████

███████████████████████████. That ██████ was



SOF ¶¶ 76, 79. Doe reported to Dr. White that Doe █████████████ due to, among other

things, ██████████████████████████████████████████████████████

███████████████████." SOF ¶ 135.[15]  Again, Doe was ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████. SOF ¶ 76.

Finally, Doe received the June 12, 2018 PRF submitted by Dr. Rougas. Notably, Dr.

Rougas included with this PRF a two-page narrative, including emails he received from Doe, to

provide full context. SOF ¶ 104. Dr. Rougas first noted that Doe had self-scheduled her OSCE

exam for June 5 at 1:30 p.m., but "[s]he did not show up as scheduled," so Jared DiChiara, CSC

---

[14] Less than a year earlier, in July 2017, Dr. White met with Doe to discuss feedback regarding ████████████████, a topic that Doe had already received feedback on in 2016 and in January 2017 and would receive again in September 2017. SOF ¶¶ 24, 32, 34.
[15] While Doe ████████████████████████████████████, it is undisputed that she did not request an accommodation at this time. *See, e.g.*, SOF ¶¶ 81, 83, 135.d,

IT Admin, AMS, reached out to her at 1:33 p.m.  She contacted him at 1:47 pm with the following email, which stated in part:

> I am so incredibly sorry – *I* 

SOF ¶¶ 89, 104.  After telling Dr. Rougas that she missed the exam ███████████████████

███████████ – and claiming that she was being "completely honest" – Dr. Rougas

responded at 2:06 p.m., asking for documentation "so that we can submit this as an excused

absence."  SOF ¶ 90.  Clearly, Dr. Rougas believed Doe's explanation and showed compassion

and understanding over ██████████████████████████, asking for

documentation so that "we" could submit it as an excused absence.  He also believed that the

seriousness of Doe's ████████ excused her failure to notify him in advance that she

would miss the exam, and he "offered her the opportunity to take the OSCE later in the week" as

Doe requested.

Doe responded by email at 2:12 p.m., asking to take the OSCE exam that Thursday, and

further telling Dr. Rougas: "███████████████████████████████

███████████████████████████████████████████

████████████."  SOF ¶ 90.  Dr. Rougas agreed to reschedule the OSCE as Doe

requested, and he also received a note from Brown's Health Services ████████████████

█████████████████."[16]  SOF ¶¶ 90, 95.  But after receiving no

_____

[16] Doe was dishonest in the June 7, 2018 note she sent to Health Services ████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████.  SOF ¶¶ 91-94, 109.

hospital note *for two days* after Doe promised she would provide one, Dr. Rougas again asked

Doe to provide it to submit the missed exam as an excused absence.  SOF ¶ 96.  Doe instead

responded by email asking if Dr. Rougas was available to meet in person, and they spoke by

phone the following morning.  Per Dr. Rougas:



SOF ¶¶ 97, 104.  The undisputed facts surrounding this incident conclusively establish that it was

patently egregious, as Doe again ████████████████████████████████████████

████████████████████████████, then lied to Dr. Rougas about why she missed it.

Brown notes three important points in connection with this incident.  *First*, Doe's claim

that she lied ████████████████████████ is in stark contrast to her prior

communications with Brown, as *just two months earlier* (in March 2018), after ████████

████████ with Dr. White, *Doe told Dr. White that* ████████████████████████ SOF ¶

135.  Indeed, Doe previously disclosed ████████ to Emily Green in or around February

2017 and again in April 2017, and to Jordan White in or around March 2018 and in an email to

Dr. White on May 1, 2018 – all *before* claiming she lied to Dr. Rougas to avoid disclosing her

████████.  SOF ¶¶ 97, 135.  *Second*, and more egregious, Doe did not voluntarily disclose to

Dr. Rougas that she lied.  Instead, *Doe provided him with* ████████████████████

████████████████████, *then allowed two days to pass without disclosing her*

***untruthfulness, and only admitted she lied when it became clear that Dr. Rougas would***

***require that she provide a hospital note that she knew she could not provide***.[17]  SOF ¶¶ 96, 97.

***Third***, Doe may attempt to minimize this instance of dishonesty by claiming that her fear of

██████████████ caused her to lie about having a ███████████████████ issue,

but the undisputed facts show that she even lied about the physical health issue itself, claiming a

████████████████████.  SOF ¶ 91.  This shows that this incident was instead an

example of Doe's "pattern of lying."

Notably, at 1:02 p.m. on June 5, 2018 – shortly before Doe's self-scheduled 1:30 p.m.

OSCE exam, and at the time she claimed to be in the midst of a debilitating episode of

███████ – Doe sent a two-paragraph, 235-word email to Dr. Margaret DiCarlo, Ph.D., Clinical

Neuropsychologist, Clinical Assistant Professor at AMS, who diagnosed Doe with ADHD,

███████████████████████████████████████████████████████

██████████████████████.  SOF ¶¶ 89, 109.

Also on June 5, 2018 – the same day she claimed to be incapacitated and unable to take

her OSCE – Doe started a text thread around noon with ██████ about vacation plans, and

then, at approximately 2:12 p.m. on June 5, 2018 – just a few minutes after her 1:47 p.m. email

to the University in which she lied about the reason she missed her 1:30 p.m. appointment for the

OSCE that day – Doe texted ██████ to ask: "Also: any interest in going to trivia tonight in

boston with ████████ etc.?," followed later by, "Yo any chance you can drive me to the

train station at 5:30 if it's still raining at that time? . . . if not I can walk."  SOF ¶ 109; *see also*

---

[17] Equally important, Dr. Rougas required the note, not to punish Doe, but ***for Doe's benefit***, to establish that the missed exam was an excused absence.  The Student Handbook includes an entire section titled "**Attendance Policy**" requiring advance notice for an absence from a scheduled event, but that "[i]n the case of illness, an absence will be approved retroactively ***with appropriate documentation***."  SOF ¶ 16.

SOF ¶¶ 89, 104.[18]  Later, at approximately 10:21 p.m. (presumably on the train ride home from trivia night in Boston), Doe texted ███████, asking "U up," and then, "How is the internet?" *See* SOF ¶ 109.

Also on June 5, 2018, Dr. DiCarlo called Brown's Diane Green, Learning Specialist at AMS, regarding Doe's email, and at 3:45 p.m., ████████████████████████████████████ ██████████████████████████████████████████████████████████████.  Doe responded at 3:58 p.m. – again, during the time when she claimed to be unable to take the OSCE exam – with a 136-word email explaining ███████████████████████████████████████ ███████.  SOF ¶ 109.  On June 7, 2018, Diane Green emailed Brown's Emily Green and informed her that Doe had been emailing about the MCASP at around 4:00 p.m. on June 5, to which Emily Green responded: "So, online and thinking about MCASP at the time she was supposed to be taking the OSCE."  SOF ¶ 109.  Those emails further provided Brown with reasonable grounds to question Doe's claim that ████████████ prevented her from taking the OSCE exam.

Meanwhile, it is undisputed that Doe told the University as part of her MCASP proceedings that she was in such a state on June 5, 2018 that ███████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████  SOF ¶ 106.d; SOF ¶ 109.i, ii.

---

[18] Publicly available records indicate that it was raining in the Providence area during the afternoon of June 5, 2018.  *E.g.*, T.F. Green Airport Station, June 5, 2018, available at https://www.wunderground.com/history/daily/us/ri/warwick/KPVD/date/2018-6-5.  Publicly available records also indicate that trains departed from Providence to Boston shortly after 5:30 p.m. on June 5, 2018.  *E.g.*, Amtrak Northeast Corridor effective as of March 10, 2018, showing Train 174 departing at 5:36 p.m.. available at https://juckins.net/amtrak_timetables/archive/timetables_NE_Corridor2_Boston-Springfield_Washington_20180310.pdf; Providence/Stoughton MBTA Line, effective as of May 21, 2018, showing Train 830 departing at 6:00 p.m., available at https://www.dbperry.net/MBTA/providence/providence_2018-05-21.pdf.

In sum, the undisputed evidence shows that throughout her tenure as an AMS student, Doe repeatedly fell short of the AMS program's professionalism and technical requirements, was informed of her shortcomings, and was offered repeated opportunities to correct them but failed to do so. This culminated in her missed exam, lying to Dr. Rougas, and acknowledging her lie only after it was clear that she could no longer maintain it. While in other contexts, chronic tardiness, missing scheduled events and deadlines, and failing to act and present oneself in an appropriate manner might be acceptable, the Student Handbook makes clear that at the AMS, such unprofessional conduct was unacceptable. And Doe's dishonesty – which she acknowledged was a "pattern" which she was "accustomed to doing" – is plainly unacceptable and egregious in **any** context, let alone at a medical school charged with preparing future physicians to provide safe and appropriate healthcare to patients.[19]

Finally, the MCASP meeting minutes from June 14 and August 9, 2018, when the MCASP voted to dismiss Doe and then affirmed that decision, respectively, show that its decision was based entirely on Doe's professionalism issues, and not due to any disability bias.

**June 14, 2018 MCASP Minutes**: These minutes reflect that the MCASP first reviewed and considered all of Doe's past professionalism reports, noting, among other things, that



. SOF ¶ 111.

---

[19] Incredibly, Doe, despite admitting to Dr. Rougas on June 8, 2018 that she lied to him, sent an email to Dean White on June 14, 2018 – just six days later – stating: "What did you mean when you told my dad you had talked to me about 'lying?' *I have no history of being dishonest with you or anyone in this school*." SOF ¶ 112. This again exemplifies Doe's dishonesty with AMS personnel.

The MCASP also reviewed and considered a letter from Doe and another from Diane Green. In her letter to the MCASP, Doe wrote:

> [redacted]

SOF ¶ 106 (unbolded italicized emphasis in original).

The MCASP then [redacted]

> [redacted].

SOF ¶ 111 (minutes reflecting comments by voting members and other AMS staff attending

meeting). Brown notes that, contrary to Doe's argument that she could only be dismissed after receiving a Professionalism Citation, the MCASP knew – ███████████████████ – that the Student Handbook authorized dismissal if Doe's offense was "particularly egregious," and the MCASP, reasonably finding the last incident particularly egregious, voted to dismiss her. SOF ¶ 111.

On June 19, 2018, Dean Tunkel wrote to Doe concerning the MCASP meeting and vote. SOF ¶ 115. In that letter, Dean ███████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
███████████████████████████████
███████████████████████████████████
█████████████████████████████████
██████████████████████████████████
███████████████████████

████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████

███████████████████████████████████████████████████

SOF ¶ 115.

Doe may argue that Dean Tunkel's letter fails to establish that the MCASP dismissed Doe because it found the lying incident "particularly egregious," and/or that it shows the MCASP improperly relied on the prior professionalism forms in dismissing her without first issuing a Professionalism Citation.  That overstates the letter's significance.

Dean Tunkel sent the letter pursuant to Section V of the 2018-2019 Student Handbook: "The Assistant Dean or the student's advisor will communicate any relevant MCASP actions to the student as soon as possible following the meeting."  SOF ¶ 14 (Ex. C at 29).  The letter plainly fulfilled that requirement.  The fact that it did not specify that Doe was being dismissed because her dishonesty was "particularly egregious" is irrelevant; there is no requirement in the Student Handbook to provide such information.

After Doe appealed her dismissal to Dean Elias, Dean Elias – rather than simply affirm the dismissal as he was entitled to do under the Student Handbook – asked the MCASP to reconsider the issue, which occurred at the MCASP's August 9, 2018 meeting.  SOF ¶¶ 117, 121. Doe and her advocate, Dr. Peter Weiss,[21] attended this meeting, during which ████████████ ███████████████████████████████████

- ███████████████████████████████████████████████████ ██████████████████████████████

- ███████████████████████████████████████████████████ ████████████████

---

[21] Dr. Weiss is ██████████████████████████████████.

[22] At her deposition, Doe testified that she believes a "white lie" is "[s]omething that is told without the intent of harm," and is "[i]nsignificant," demonstrating that even today, Doe believes that certain lies are acceptable, and that she still does not grasp the severity of her lie and the serious implications of dishonesty by a physician entrusted with providing competent medical care.  SOF ¶¶ 121.a, 123.d.



[redacted]

- [redacted]

- [redacted] In other words, Doe did not voluntarily disclose her dishonesty; instead, she maintained her lie until it became clear Dr. Rougas required the hospital note, which Doe knew she could not provide, and only then did she confess to lying.

- [redacted] One of the AMS's mandatory technical standards notes that students "must be able … to function effectively under stress," SOF ¶ 12 – making Doe's admitted dishonesty in such situations even more troubling.

- [redacted].'"

SOF ¶ 121.

After Doe and Dr. Weiss left the meeting, the MCASP discussed the issue:

- [redacted]

- [redacted]

- [redacted]

- ███████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████

SOF ¶ 121.  The MCASP then voted overwhelmingly (7-1) to sustain the dismissal, held a third meeting on September 20, 2018 with Dean Elias to discuss Doe's case in greater detail, and on September 24, 2018, Dean Elias wrote to Doe informing her that he had sustained the MCASP's dismissal decision.  SOF ¶¶ 124, 130, 131.  As stated in the Student Handbook, "[t]he decision of the Dean is final."  SOF ¶ 15.

These undisputed facts conclusively show that the MCASP and Dean Elias showed no disability bias whatsoever.  Indeed, Doe and Dr. Weiss both agreed with the MCASP that her ███████ did ***not*** cause her dishonesty.  Instead, the MCASP dismissed Doe based on her lack of professionalism, repeated failure to respond to feedback and to correct her unprofessional behaviors, and dishonesty in violation of the AMS's professionalism and technical requirements.

On this record, it cannot be disputed that Doe was not otherwise qualified for the AMS program, as she simply could not fulfill the AMS program's professionalism and technical requirements – applicable to ***all*** AMS students – despite receiving ongoing feedback and the MCASP providing her multiple opportunities to correct her behavior.  The MCASP undertook careful deliberation when considering Doe's academic performance and acted consistently with the Student Handbook's established policies and procedures – policies and procedures of which Doe was indisputably aware.  Moreover, there is not a shred of evidence of impermissible discriminatory intent; instead, the undisputed facts uniformly establish that the MCASP acted for purely academic reasons, and concerns that Doe's dishonesty, poor judgment, and unprofessionalism would pose a safety risk for her future patients.  The MCASP's decision

should not be overturned by this Court, as there is no evidence from which to conclude that the MCASP "substantial[ly] depart[ed] from accepted academic norms as to demonstrate that the … committee responsible did not actually exercise professional judgment."  *Ewing*, 474 U.S. at 225.

The only reasonable conclusion on this record, particularly given the substantial deference afforded the MCASP's determinations concerning Doe's academic qualifications, is that Doe was dismissed due to her failure to fulfill the academic requirements applicable to all students in the AMS program, and not because of any disability bias.  Under the first step of the *McDonnell Douglas* burden-shifting framework, summary judgment should enter for Brown because Doe cannot establish initially that she was otherwise qualified.  *See Neal v. E. Carolina Univ.*, 53 F.4th 130, 149-50 (4th Cir. 2022) (student not "otherwise qualified to remain enrolled in the MSW Program" when the university determined the student failed to meet professionalism standards); *Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015) (affirming medical school's dismissal of student on professionalism grounds; "dismissal on professionalism grounds amounts to a deference-receiving academic judgment"); *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998) (affirming summary judgment against plaintiff who "[d]espite the accommodations, including being allowed to take her exams in a separate room and having extra time to take them, . . . failed biochemistry" and was dismissed from the program); *see also Falcone v. University of Minnesota*, 388 F.3d. 656, 659 (8th Cir. 2004) (Rehabilitation Act does not require educational institution to lower its standards for achieving a professional degree by eliminating or substantially modifying its training requirements); *Yaldo*, 266 F. Supp. 3d at 1012 (granting summary judgment to medical school where student violated professionalism and technical standards that required, among other things, honesty and personal responsibility, where student offered no evidence that he exhibited

40

the required honesty and personal responsibility).  The Fourth Circuit in *Neal* sums up the

principle of "otherwise qualified" succinctly:

> We in no way make light of mental illness. However, for purposes of assessing ADA compliance, universities have a responsibility to the entire academic community and to the public to ensure that a student is qualified to meet the lawful requirements of their program especially where, as here, conferral of a degree is a prerequisite to state licensure requirements.

*Neal*, 53 F.4th at 153.

And under the third step of *McDonnell Douglas*, even if Doe could make it that far

(which she cannot), there is no evidence of impermissible discriminatory intent to overcome the

abundant evidence of Brown's non-discriminatory reasons for dismissing her.  There is no

evidence that the University dismissed Doe on the basis of her disability.  In addition, "a

university is lawfully permitted to dismiss a student on account of misconduct triggered by a

disability."  *Neal v. E. Carolina Univ.*, 53 F.4th 130, 150 (4th Cir. 2022). "[M]isconduct—even

misconduct related to a disability—is not itself a disability and may be grounds for dismissal."

*Id.* (citing *Halpern*, 669 F.3d at 464 and noting "[n]umerous authorities acknowledge the same

distinction.").

### b. Doe's Accommodation Claim Fails Because Brown Granted Her Only Timely-Requested Accommodation Of Taking A Year Off Starting In October Or November 2018

The undisputed evidence also shows that Doe cannot prevail on her failure to

accommodate claims for at least three interrelated reasons.  *First*, Doe admits that Brown granted

her only timely requested accommodation – to take a year off starting in October or November

2018.  *Second*, nearly all of Doe's unprofessional behavior occurred *before* she first requested an

accommodation on May 17, 2018, and settled law holds that her prior unprofessional behavior is

not excused by her subsequent accommodation request.  *Third*, despite Brown suggesting, in

March 2018, that Doe take time off, Doe, for personal and professional reasons, rejected that

suggestion, then waited until May 17, 2018 to request taking a year off ***starting in October or November 2018***, well after she had incurred ***all*** of her professionalism reports.  Doe never requested a prospective accommodation to allow her to lie to a member of the AMS faculty.

Doe testified unequivocally that Brown never denied her an accommodation:

Q.  I want to know if she [*i.e.*, Doe] ever, throughout her career at the medical school, sought something and did not receive it from the medical school.

A.  To the best of my recollection, I didn't, no.

SOF ¶ 83.  While this clear admission should be dispositive of Doe's accommodation claims, Brown nevertheless addresses the other undisputed record evidence establishing that Brown afforded Doe the sole accommodation she timely sought – taking a year off starting in October or November 2018 – and Doe was never denied a timely-requested accommodation.

Doe testified that she first requested an accommodation from Brown, in the form of taking a year off from school, on May 17, 2018, although Doe also admitted that Dean White had previously suggested, in February or March 2018, that Doe take a year off starting immediately. SOF ¶¶ 73, 81.  At the time of her May 17, 2018, request, Doe had already incurred all of her professionalism reports except for her final June 2018 PRF concerning the missed exam and lie. As Doe did not request an accommodation before May 17, 2018, she cannot assert her disability or Brown's purported failure to offer an accommodation to excuse her prior documented unprofessionalism.  *See, e.g., Trahan v. Wayfair Me., LLC*, 957 F.3d 54, 65-66 (1st Cir. 2020) ("the ADA does not oblige [the defendant] to accommodate a[] [plaintiff]'s disability retroactively," since an accommodation request seeking to excuse past conduct "is better understood as a plea either for forgiveness or a second chance") and authorities cited.

Doe also testified that, despite Dean White suggesting that she take a year off in February/March 2018, Doe rejected that suggestion and, when she requested an accommodation

42

on May 17, 2018, instead asked to take a year off beginning in October or November 2018, well

after **all** of her professionalism reports and dismissal.  Doe testified that her choice to postpone

taking a year off until October or November 2018 was based on conversations with family

members, re-reading Dr. DiCarlo's report, and her personal desire to remain in the AMS

program until that time so that she could ███████████████████████.  SOF ¶¶ 73,

85.  Her decision was **not** based on any action or inaction by Brown; indeed, Brown expressly

suggested that she take time off well **before** Doe requested that same accommodation.  Doe

testified:

> Q.  At some point, Jordan White recommended that you consider taking a year off, correct?
>
> A.  Correct.
>
> Q.  What do you recall her saying to you in that regard?
>
> A.  …  To the best of my recollection, she said "Have you ever thought about taking a year off?"  I said "No."
>
> And she said, "Do you think that might be something that could be good for you?  I think it might be a good idea given the things that are going on with the board and going on with you."
>
> And I said, you know, I – I said **I didn't think about it.  I wanted to match up** ████████████ **and my friends and that was it**.
>
> Q.  Okay.  Now, once you decided that you wanted to pursue that, you indicated that you wanted to take the year beginning in – I believe it was October or November, correct?
>
> A.  Correct.
>
> Q.  Okay.  What caused you wanting to start the leave in October or November?
>
> A.  I had met with Alex Morang, who is a career adviser, and at that point in time I was still considering – **I still wanted to do not only what was best for my** ████ ████ **but also for my career, and given the timing, because most people who are taking a year off had made that decision prior to this**.
>
> Of course it was planned out so they [*i.e.*, "most people who are taking a year off"] had set things in place to make sure that during that year off they stayed

productive and, you know, it wasn't ruining their chance of getting into a residency or, you know, making their resume look like they just took a break.

So speaking with her, because it was so late, **we discussed different options** and she said some people do that so that way I can finish getting some of the ones out of the way, my rotations, and then I would have time to plan a research or something that would keep me busy and still keep my foot in the medical, you know, educational community, and then I would start again the following spring.

Q.  And you decided that you thought that was the right path for you at that point; is that fair to say?

A.  After the … discussion with Alex Morang, *that seemed like the best option for me in terms of taking the time I needed but also not just abruptly stopping my medical career without really knowing what to do*.

Q.  Okay, and you made that request known to Dean White, correct?

A.  I believe so.

Q.  Okay.  That that was your request that you take the year but that it begin in October or November, correct?

A.  Correct.

SOF ¶ 85.  Having chosen to postpone taking time off, Doe cannot now claim she was denied an accommodation, that Brown rejected her request, or that she could have fulfilled the AMS program's professionalism requirements with her requested accommodation.

Doe further admitted that, while she eventually came to believe she should take time off starting immediately, she only considered that accommodation *after* the MCASP voted to dismiss her and she appealed her dismissal:

Q.  Now, did that ever change, the timing of your leave?  Did you ever submit a request for leaving at a different time, different than taking it from October or November [of 2018] through that year?  Did you ever change the timing of the request?

A.  To the best of my knowledge, *I didn't officially change the timing of my request*.  You know, *I believe that once I appealed to the board and kind of realized that, you know, they – they didn't want me there for those last three months or whatever, I was willing to take my leave starting right away* but I don't recall formally requesting a change.

44

SOF ¶ 86.[23]  While Doe did not recall formally requesting to take time off starting immediately, she did submit such a request, but not until July 17, 2018.  SOF ¶ 86.  Thus, (1) in May 2018, after incurring all professionalism reports except one, Doe asked to take a year off starting in October or November 2018, (2) Brown agreed to Doe's request, (3) Doe then missed her OSCE exam and lied about it in June 2018, incurring her final PRF, (4) the MCASP voted to dismiss Doe, (5) Doe appealed the dismissal, and (6) only *after* she had been dismissed, and *after* she lodged her dismissal appeal, did Doe first request "tak[ing] my leave starting right away."  Under settled law, Doe's request came too late.

In *Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454 (4th Cir. 2012), the Fourth Circuit affirmed summary judgment for a medical school on a student's ADA and Rehabilitation Act claims of failure to accommodate.  As in this case, the plaintiff in *Halpern* suffered from ADHD, and repeatedly engaged in unprofessional conduct – including showing up late or not at all to required events without advance notice, failing to meet deadlines, dishonesty, and failing to accept and act on constructive criticism – that fell below the medical school program's professionalism requirements.  *Halpern*, 669 F.3d at 457-60.  Despite being afforded numerous opportunities to correct his unprofessional behavior, the plaintiff failed to do so.  *Id.* Critically, prior to being dismissed, the plaintiff had disclosed his ADHD to the school and sought and received an accommodation in the form of additional exam-taking time, but because his professionalism issues persisted despite the accommodation, the school's Student Progress and Promotions Committee ("SPPC") recommended that he be dismissed.  *Id.*  As in this case, it was only when the plaintiff appealed the SPPC's dismissal recommendation that he first sought a

---

[23] The fact that it was not until *after* the MCASP had already voted once *to dismiss her*, and she had appealed her dismissal, that she "kind of realized that, you know, they – they didn't want [her] there" further evidences Doe's inability to recognize and accept her professionalism issues, let alone act to correct them.

further accommodation that, he claimed, would have resolved his professionalism issues.  *Id.*

In affirming summary judgment for the school, the Fourth Circuit first noted the judicial deference afforded schools' academics-related decisions, and that professionalism is an "essential" academic requirement.  *Id.* at 463.  The court then explained that the plaintiff's request for further accommodation came too late:

> First, [plaintiff]'s request for an accommodation was untimely.  The school was not obligated to accommodate [plaintiff]'s disability until he provided a proper diagnosis … and requested specific accommodation.  [Plaintiff] failed to inform Wake Forest that he was disabled until December 2007, and when he did so, he requested only testing accommodations. … He suggested, for the first time, that his behavioral problems were manifestations of a disability in his letter to Dr. Ober appealing the SPPC's recommendation of dismissal.
>
> We have previously observed that ***misconduct—even misconduct related to a disability—is not itself a disability and may be a basis for dismissal.  By the time [plaintiff] requested that the Medical School implement his special remediation plan, he had already engaged in numerous unprofessional acts that warranted his dismissal***, including acting abusively towards staff, multiple unexcused absences, repeated failure to meet deadlines, and tardiness.  Thus, ***[plaintiff] sought not a disability accommodation, but a second chance to better control [his] treatable medical condition.  This, however, is not a cause of action under the ADA***.  A school, if informed that a student has a disability with behavioral manifestations, may be obliged to make accommodations to help the student avoid engaging in misconduct.  But, ***the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability***.  [Plaintiff]'s argument that he was owed an opportunity to continue at the Medical School and correct his misbehavior is, therefore, without merit.

*Id.* at 465 (internal quotation marks and citations omitted).  The court further noted that the student's proposed accommodation did not specify when, if the accommodation was offered, he would overcome his lack of professionalism, and rejected the student's argument that the school should have, after his untimely accommodation request, engaged in an interactive process to identify a reasonable accommodation, since such a process "would not have corrected the untimeliness of [plaintiff]'s request or erased his record of prior misconduct."  *Id.* at 466.

The court concluded by noting that the school, like Brown, "made significant efforts

throughout the period of [plaintiff]'s enrollment to help him satisfy its academic and professional standards," and concluded that

> despite these efforts, [plaintiff]'s lack of professionalism remained an issue. ***Where a professional school has reasonably determined based on an identifiable pattern of prior conduct that a student is unfit to join his chosen profession, federal law does not obligate the school to allow that student to remain in and graduate from its educational program***.

*Id.* at 466-67.  The rule that a request for an accommodation does not excuse past conduct, even if that conduct is tied to a disability, is well settled.  *See, e.g., Neal v. E. Carolina Univ.*, 53 F.4th 130, 153 (4th Cir. 2022) (student's dismissal from master's of social work upheld, "[the university] was not required to retroactively excuse misconduct related to her later Bipolar diagnosis") and cases cited; *Profita v. Regents of the Univ. of Colo.*, 709 F. App'x 917, 921-24 (10th Cir. 2017) (affirming dismissal of medical student's ADA suit where student requested accommodations after being dismissed from medical school; school "is not required to reasonably accommodate [student]'s disability by overlooking his previous misconduct, even if that misconduct resulted from his disability") and cases cited; *Trahan v. Wayfair Me., LLC*, 957 F.3d 54, 64-66 (1st Cir. 2020) (noting, in an employee's ADA suit, that the ADA "does not oblige an employer to accommodate an employee's disability retroactively," and that an accommodation that seeks to excuse past conduct "is unreasonable as a matter of law") and cases cited; *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795-96, 796 n.3 (1st Cir. 1992) (affirming summary judgment where medical school student requested accommodation only after failing exam and being dismissed); *Zimmeck*, 106 F. Supp. 3d at 782-83 (it is student's duty to timely inform medical school of disability and request accommodation; if student fails to do so, school may dismiss her based on conduct "even if the school later learns that the conduct was the manifestation of a disability")), *aff'd* 2015 U.S. App. LEXIS 21441 (4th Cir. Dec. 11, 2015); *see also Davis v. PHK Staffing LLC*, No. 2:21-cv-02142-HLT, 2022 U.S. Dist. LEXIS 182726, at

*18 (D. Kan. Oct. 5, 2022) (defendant not liable for failure to excuse past absences, "the ADAAA does not require retroactive relief. . . . A request for a retroactive accommodation is unreasonable."); *cf. Pepper v. Brown Univ.*, No. 21-248-JJM-PAS, 2023 U.S. Dist. LEXIS 198182, at *13 (D.R.I. Nov. 2, 2023) ("Brown's ultimate response to Mr. Pepper's request for an accommodation will never be known because of Mr. Pepper's own violent actions in the workplace resulting in his termination.").

The result should be the same here.  Doe first requested an accommodation after she received all but one of her PRFs, and the ***only*** accommodation she timely requested – and which Brown granted – was to take a year off starting in October or November 2018.  Doe did not request an accommodation to permit her to lie to the AMS faculty.  She then incurred her final PRF for missing her exam and lying, after which the MCASP voted to dismiss her.  It was only after she appealed that decision that she, for the first time, requested taking time off starting immediately.  At that point, it was too late.  As in *Halpern*, Doe's late accommodation request "sought not a disability accommodation, but a second chance to better control [her] treatable medical condition" which, as the Fourth Circuit noted, "is not a cause of action under the ADA." *Halpern*, 669 F.3d at 465.  In these circumstances, "the law does not require [Brown] to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability" – especially dishonesty, which could, if Doe received an AMS degree, pose a risk of harm to patients – and Brown did not deny Doe a reasonable accommodation.  *Id.*; *see also Driscoll v. Bryant Univ.*, 393 F. Supp. 3d 153, 160 n.12 (D.R.I. 2019) (granting summary judgment to school where student failed to inform school of his issues with an accommodation until "he was failing and on the brink of dismissal;" "[A]n academic institution can be expected

48

only to respond to what it knows" (citation omitted)).[24]

Importantly, Doe may claim that Brown should have excused her lying in light of her

████. Even setting aside that she and Dr. Weiss ████████████ did not cause or excuse her

lying, the Student Handbook (and common sense) makes clear that professionalism, good

judgment, and integrity are essential components of the AMS program's academic standards, and

settled law holds that Brown is **not** obligated to lower its essential AMS program standards or

make substantial alterations to its program to accommodate Doe's dishonesty. *See Bercovitch v.*

*Baldwin Sch.*, 133 F.3d 141, 154 (1st Cir. 1998) ("[t]he law does not require an academic

program to compromise its integral criteria to accommodate a disabled individual"); *Wynne*, 976

F.2d at 795 (affirming Tufts' dismissal of medical student where granting requested

accommodation "would require substantial program alterations, result in lowering academic

standards, and devalue Tufts' end product – highly trained physicians carrying the prized

credential of a Tufts degree"); *Zimmeck*, 106 F. Supp. 3d at 782 (where professionalism is an

essential requirement of medical school program, "changing or lessening those standards …

would not be a reasonable accommodation"), *aff'd* 2015 U.S. App. LEXIS 21441 (4th Cir. Dec.

11, 2015); *Falcone*, 388 F.3d. at 659 (Rehabilitation Act does not require that an educational

institution lower its standards for receiving a professional degree by eliminating or substantially

modifying its training requirements). Doe cannot credibly claim that it would be a reasonable

---

[24] Brown notes that Doe's accommodation claims seem to concern Brown's justified refusal to excuse her past conduct after learning of her disability. SOF ¶ 84 ("And also just the fact that when – when the diagnosis came through, I was still dismissed. ***Nothing was relooked at. No one went back and said, oh, my gosh, this – this explains it.*** This is something that, you know, she didn't even know about and – and it's tied to everything that we have been crucifying her for. They didn't do that."); SOF ¶ 84 (after disclosing her ████████████ to Brown, "*[t]he thing that they were* punishing – not punishing me, *giving me professionalism warnings for could be explained by that* when they saw that pattern. … This was relayed back to Brown and *instead of saying, okay, you were right, this is what caused this, that explains it, we should get her help, they kept the very – they didn't take away any of the professionalism warnings*, any of them"). As noted above, Doe's disability and accommodation request do not, as a matter of law, excuse her past conduct.

accommodation to allow her to lie. *Wynne*, 976 F.2d at 793 (university need only come to a rationally justifiable conclusion that alternatives would lower academic standards or require substantial program alteration).

In addition, such a modification would fundamentally alter the nature of the AMS program. *See, e.g.*, *Driscoll*, 393 F. Supp. 3d at 159. The AMS Student Handbook provides that the standard for professional behavior includes honesty, and specifically states that "intellectual dishonesty [is] wrong not only because such behavior violates intrinsic academic integrity, but also because such behavior may be deleterious to patients." SOF ¶ 11. The University repeatedly expressed serious concern regarding the effect Doe's dishonesty could have on patient safety. *See, e.g.*, SOF ¶ 111 ("Several Committee members stated the student posed a potential risk to herself and to her patients"); SOF ¶ 121 (during subsequent meeting, MCASP "discussed how dangerous her pattern of lying is with regard to patient care" and "if they want [Doe] treating patients"); SOF ¶ 150 ("being honest and telling the truth is a fundamental tenant [sic] of being a physician"). For these reasons, and those stated above, granting an accommodation to allow Doe to lie would constitute a fundamental alteration of the AMS program.

Brown also notes that, after Doe appealed the MCASP's initial dismissal decision, she provided a package of materials to Dean Elias, and Dean Elias, in order to ensure that the MCASP reconsidered its dismissal decision with the benefit of everything Doe had provided in support of her appeal, provided those materials to the MCASP and directed the MCASP to reconsider its decision in light of those materials. He testified:

> Q. After receiving the notice of dismissal by the committee and [Doe]'s appeal package to you, did you actually - - did you send the case back to the committee?
>
> A. Yes, I did.
>
> Q. Okay. And did not notify [Doe] in a June 27th letter?

A.  I don't know the date on the letter, but I'll take your word for it.  June 27th, yes.

…

Q.  And does it indicate in your letter - - did you indicate in your letter:
."

A.  That's what it says.

Q. ?

A.  I wanted to make sure that everything that was in her packet that was sent to me was in the hands of the committee, and that they have a full set of materials.

…

Q.  So, you wanted to make sure that to the extent that they were not previously supplied, that other information including, but not limited to , that was all part of the - -

A.  I wanted to be sure that they had a chance to fully digest the response.

SOF ¶ 117.  Thus, before reconsidering its dismissal decision, the MCASP had all of the information that Doe believed it should consider in deciding whether to affirm or reverse that decision.

Finally, Doe may claim that she requested an accommodation in connection with the medical boards exam, but as Doe admitted at her deposition, Brown never denied her any testing accommodation because she never requested one.  SOF ¶ 87 (confirming Doe never requested a testing accommodation).[25]

---

[25] Doe did ask Brown for an extension of time to take her medical boards, but that test is not administered by Brown, and instead is administered by the U.S. Medical Licensing Examination Board ("USMLE Board"), and while Brown offered Doe assistance in requesting an accommodation for the boards, it is the USMLE Board – not Brown – that, had Doe submitted an accommodation request, would determine whether to grant the requested accommodation.  SOF ¶ 88 (Doe did not request a testing accommodation;

In sum, Doe cannot avoid summary judgment on her failure to accommodate claim because the undisputed facts show that (1) she rejected Brown's suggestion in February/March 2018 to take time off starting immediately, (2) when she finally requested an accommodation on May 17, 2018, she had incurred all professionalism reports except her June 2018 PRF, (3) Brown agreed to Doe's requested accommodation of taking a year off starting in October or November 2018, (4) Doe then incurred her final PRF for missing the exam and lying, after which the MCASP voted to dismiss her, and (5) Doe asked to take a year off starting immediately only *after* she had been dismissed and her appeal was pending.  Moreover, while Doe may have been able to continue in the AMS program if Brown had lowered its AMS program standards, Brown was plainly not required to do so, nor was it required to tailor a less vigorous program by which Doe would be awarded an AMS degree without establishing that she possessed the requisite professionalism.  *See Bercovitch*, 133 F.3d at 154.  On this record, summary judgment should enter for Brown.

### c.  Doe Was Dishonest Throughout Her Tenure at the AMS

Doe's dishonesty while at the AMS is not limited to her lie to Dr. Rougas regarding why she missed her OSCE exam.  The record is replete with other instances of Doe's dishonesty.  Before listing that evidence, Brown first shows that the evidence is admissible under Fed. R. Evid. 405(b) ("Rule 405(b)"), because one of Brown's defenses to Doe's claims is that she failed to fulfill the AMS's technical requirements and professionalism standards of good judgment and integrity, or honesty.  SOF ¶ 12.  This makes Doe's character for dishonesty an essential element of Brown's defense.

Rule 405(b) provides:

---

no one at Brown suggested she could not have such an accommodation); SOF ¶ 88 (Brown provided Doe with the information needed to request accommodations from the USMLE Board).

**Rule 405.  Methods of Proving Character**

…

**(b) By Specific Instances of Conduct.**  When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

Courts agree that a person's character or character traits are an "essential element" of a claim or defense where "it alters the rights and liabilities of the parties under the substantive law." *Schafer v. Time, Inc.*, 142 F.3d 1361, 1371 (11th Cir. 1998); *see also* 2 *Weinstein's Federal Evidence* § 404.10 (character trait admissible when the trait itself is significant as an element of a claim or defense).  The relevant question is whether proof of the character trait by itself actually satisfies a defense to a claim – if so, then character is an essential element of a defense.  *See United States v. Keiser*, 57 F.3d 847, 856 (9th Cir. 1995); *Davis v. Grynkewicz*, No. 1:12-CV-587, 2013 U.S. Dist. LEXIS 72307, at *6 (M.D. Pa. May 22, 2013) ("It is not sufficient that the character trait tend to prove elements of the claim, rather character must be an element itself."). Stated another way, the existence or nonexistence of the character trait itself determines the rights and liabilities of the parties.  *Perrin v. Anderson*, 784 F.2d 1040, 1045 (10th Cir. 1986); *cf. Pugh v. See's Candies*, 203 Cal. App. 3d 743, 757 (Cal. App. 1988) (plaintiff asserted he was an excellent employee, never criticized, never argumentative, and always cooperative; specific acts of misconduct found admissible to show that employee was unfit or incompetent, interpreting California law).

As applied here, if Doe lacks integrity and is dishonest, it provides Brown with a defense and alters substantive rights under the AMS's technical and professionalism standards.  SOF ¶¶ 11, 12.  Doe's propensity for dishonest and unprofessional behavior is an essential element of one of Brown's defenses, and thus specific instances of Doe's dishonesty and unprofessionalism beyond Doe's false statements to Dr. Rougas and Jared DiChiara about missing the OSCE

should therefore be admitted.

Under Rule 405(b), other specific instances of Doe exhibiting the character trait of dishonesty include, but are not limited to:

- On April 19, 2017, ███████████████████████████████████████ ██████████████████████████████████.” SOF ¶ 142.

- On November 1, 2017, the Assistant Director of the Doctoring Program at AMS wrote: “████████████████████████████████████████ ████████████████████.” SOF ¶¶ 36, 37.

- In an evaluation dated December 1, 2017, an evaluator at AMS wrote that ████ ███████████████████████████████████████ ████████████████████.’” SOF ¶ 47.

- For the January 25, 2018 MCASP meeting, Doe told the MCASP ████████ ███████████████████████████████████████ ████████████████████. *E.g.*, SOF ¶ 108.

- Doe did not ████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████.” SOF ¶ 91; *see also* SOF 109.b.iv

- ███████████████████████████████████████ ███████████████████████████████████████ ████████████████. SOF ¶¶ 92, 93.

- ███████████████████████████████████████ █████████████████████████. SOF ¶¶ 99-101.

- ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████



.”  SOF ¶¶ 107, 109, 113.

•  ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ██████████████████████.”  SOF ¶ 109.c.

•  Meanwhile, at the same time Doe claimed ████████████████████
   ████████████████████████████████████████████
   █████████████████████████ SOF ¶ 106.d; SOF ¶ 109.i,
   ii., Doe started a text thread around noon on June 5, 2018 with ████████ about vacation
   plans, and then, at approximately 2:12 p.m. on June 5, 2018 – just a few minutes after her
   1:47 p.m. email to the University in which she lied about the reason she missed her 1:30
   p.m. appointment for the OSCE that day – Doe texted ████████ to ask: "Also: any
   interest in going to trivia tonight in boston with ██████████ etc.?," followed later
   by, "Yo any chance you can drive me to the train station at 5:30 if it's still raining at that
   time? . . . if not I can walk."  SOF ¶ 109; *see also* SOF ¶¶ 89, 104.  Later, during the
   evening of June 5, 2018, at approximately 10:21 p.m. (presumably on the train ride home
   from trivia night in Boston), Doe texted ██████, asking "U up," and later, "How is the
   internet?"  *See* SOF ¶ 109.

•  ██████████████████████████████████████████
   ██████

   ██████

   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   █████████████████.

   SOF ¶ 143.



- [redacted]." SOF ¶¶ 40, 144; *see also* SOF ¶ 146.

- [redacted]." SOF ¶ 113.

- [redacted]:

  > [redacted].

  SOF ¶ 146.

- [redacted]:

  > [redacted].

  SOF ¶ 147.

- In or around August 2020, Doe sent a cover letter to a potential employer that stated in part: "I quickly realized I had a knack for identifying limitations within hospital networks and initiating strategies to correct them. So much so, in fact, that I put a hold on my medical training after my third year to explore the policymaking side of health side of health care[sic] [redacted]." SOF ¶ 148.

- Doe's resume to potential employers after she was dismissed from medical school stated, "Alpert Medical School, Providence, RI, Expected Graduation: May 2024." SOF ¶ 149.

These additional incidents of Doe's dishonesty – especially her dishonesty regarding information

she claimed to have obtained from ***patients*** – show that she lacked integrity and could not meet the technical standards and the professionalism standards for AMS, and provide a complete defense showing that Brown acted appropriately both in warning and, ultimately, dismissing Doe from the AMS.

### d. Doe Cannot Dispute That, After She Requested An Accommodation, Brown Explored Alternatives To Her Chosen Accommodation Of Taking A Year Off Starting In October Or November 2018

Doe similarly cannot show that, once she requested an accommodation on May 17, 2018, Brown failed to explore alternatives with her. *See Doe v. Brown Univ.*, 2020 U.S. Dist. LEXIS 42188, *7-*8 (D.R.I. Mar. 11, 2020) (determination of whether plaintiff is otherwise qualified includes whether reasonable accommodations will satisfy both the school's and plaintiff's interest, and extent to which school explored alternatives). Indeed, it was Brown that first suggested Doe take a year off, which Doe initially rejected. SOF ¶ 85. And once Doe changed her mind and, on May 17, 2018, requested taking a year off starting in October or November 2018, she met with Alex Morang and, during that meeting, Doe and Ms. Morang "***discussed different options***[.]" SOF ¶¶ 82, 85 (describing meeting with Ms. Morang, during which Ms. Morang "told me, you know, what my options were"). After Doe and Ms. Morang explored those "different options," and despite Dean White's previous suggestion that Doe take a year off starting immediately, Doe chose to take a year off starting in October or November 2018, to which Brown agreed. By delaying her year off until that time, Doe chose to remain in, and be subject to the requirements of, the AMS program, including taking the self-scheduled OSCE exam which she missed and lied about, resulting in her final PRF and dismissal. While Doe may regret her choice, she cannot dispute that Brown fulfilled its obligation to explore alternative accommodations with her.

### E. To The Extent Doe Claims Disparate Treatment, No Evidence Supports Her Claim,

**and There is No Evidence of Pretext**

While it is not entirely clear from her Complaint that Doe is asserting a disparate treatment claim, to the extent she does, Brown notes that there is no record evidence to support it. To show disparate treatment, Doe must offer evidence that "(1) identif[ies] the challenged … practice or policy, and pinpoint[s] the defendant's use of it, (2) demonstrate[s] a disparate impact on a group characteristic … that falls within the protective ambit of [the ADA]; and (3) demonstrate[s] a causal relationship between the identified practice and the disparate impact." *Angelika P. v. Town of Meredith*, 2022 U.S. Dist. LEXIS 42031, *25 (D.N.H. Mar. 9, 2022).

Doe cannot satisfy her burden because there is no record evidence of a practice or policy at Brown that was not applied uniformly to all AMS students, or that Doe was treated differently than other similarly situated AMS students. Indeed, the record reflects that, when Doe and another student failed to timely complete the VA Medicine IT module, both Doe and the other student received a PRF. SOF ¶ 52. With no evidence of disparate treatment, summary judgment should enter for Brown.[26] *E.g.*, *Bazzi v. Wayne State Univ.*, No. 21-cv-10642, 2023 U.S. Dist. LEXIS 326, at *29-30 (E.D. Mich. Jan. 3, 2023).

In addition, for the reasons stated above, Brown has articulated non-discriminatory reasons for the allegedly discriminatory action under *McDonnell Douglas*. Doe can present no evidence that creates a triable issue of fact on whether the action complained of is merely pretext

---

[26] To the extent Doe claims that she was treated differently from others because she received her Professionalism Warning after just one PRF, the claim fails for lack of evidence of other similarly-situated students being treated differently, and more fundamentally, because the MCASP was fully authorized under the 2017-2018 Student Handbook to consider her prior written professionalism reports, and not just the PRF, in issuing the Professionalism Warning. SOF ¶ 13. As noted *supra* and in the Statement of Facts, Doe had a long track record of professionalism concerns and receiving feedback about those concerns before she received a Professionalism Warning. Moreover, Brown was indisputably *not* aware of Doe's disability at that time and could not have treated her differently based on a disability of which it was not aware. *Wynne*, 976 F.2d at 795 ("[A]n academic institution can be expected only to respond to what it knows").

for behavior actually motivated by discrimination.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (evidence of pretext means that a "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"); *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (not enough for a plaintiff merely to impugn the veracity of the justification; plaintiff must elucidate specific facts that would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the real motive)).

### F.  Summary Judgment Should Enter For Brown On Doe's Contract Claims

Doe asserts two contract claims.  ***First***, she asserts that Brown breached the Discrimination and Harassment Policy by unlawfully discriminating against her.  Summary judgment should enter for Brown because (1) Brown did not unlawfully discriminate against Doe, as explained above, (2) the language that Doe contends Brown violated cannot constitute a valid contract because it merely states Brown's pre-existing legal duty to not engage in "unlawful discrimination and harassment," and (3) any other language on which Doe relies constitutes statements of aspiration and intent that cannot form a binding contract.

***Second***, Doe asserts that Brown breached the 2016-2017 version of the Student Handbook by failing to follow the procedures set out therein.  Summary judgment should enter for Brown on that claim because Brown took action regarding Doe under the 2017-2018 Student Handbook and dismissed her under the 2018-2019 Student Handbook, and Brown followed the guidelines and dismissal procedures set out therein.

#### 1.  Brown Did Not Breach The Discrimination And Harassment Policy, Which Reaffirms Brown's Preexisting Legal Duty To Not Violate Anti-Discrimination And Anti-Harassment Laws

The portion of the Discrimination and Harassment Policy that Doe asserts Brown

breached provides in relevant part:

### I.  POLICY

Brown University's mission "to serve the community, the nation, and the world by discovering, communicating, and preserving knowledge and understanding in a spirit of free inquiry, and by educating and preparing students to discharge the offices of life with usefulness and reputation" makes it incumbent on the university to create and maintain an educational, working, and living environment that is free from any form of ***unlawful discrimination and harassment***. ***Unlawful discrimination and harassment*** cannot be tolerated in a community aspiring to achieve this mission.

**Definition of Unlawful Discrimination**
***Unlawful discrimination is defined by federal and/or state statutes*** (***see Appendix A***) to include unfavorable or unfair treatment of a person or class of persons because of race, color, religion, sex, national origin, age, disability, veteran status, sexual orientation, gender identity, and gender expression.

**Definition of Unlawful Harassment**
***Unlawful harassment is harassment*** that refers to or is based upon the protected status of the person or persons being harassed, ***as defined by relevant federal and/or state statutes*** (***see Appendix A***). ***Unlawful harassment*** in the work and educational environment is created if conduct of another person is sufficiently serious that it interferes with an employee's ability to perform their job or denies or limits a student's ability to participate in or benefit from the University's programs and thus creates a hostile work or learning environment.

SOF ¶ 17.  In turn, Appendix A to the Discrimination and Harassment Policy provides:

**Appendix A: Federal and State Laws**

In addition to the policy statements set forth in Appendix A(sic),[27] which reflect the University's commitment to creating and maintaining an educational, working, and living environment that is free of any ***unlawful discrimination***, ***Brown University recognizes its legal obligations*** to pursue that same goal ***under applicable Federal and State statutes***, which include:

- Title VI of the Civil Rights Act of 1964
- Title VII of the Civil Rights Act of 1964

---

[27] This is a typographical error, and should read "Appendix B," since Appendix B to the Discrimination and Harassment Policy is titled "**Appendix B: Brown University Statements and Policies**," and sets out Brown's Statement of Non-Discrimination, its policy on Standards of Student Conduct, and its policy of equal employment opportunity and affirmative action, and notes that "[t]hese policies and sentiments are also reflected in" Brown's Faculty Rules and Regulations, its Student Rights and Responsibilities, and its Human Resources Policies and Practices.

- Equal Pay Act of 1963
- Vietnam Era Veteran's Readjustment Assistance Act of 1974
- Age Discrimination in Employment Act of 1967
- Age Discrimination Act of 1975
- Title IX of the Education Amendments of 1972
- ***The Rehabilitation Act of 1973***
- ***The Americans with Disabilities Act***
- The Older Workers' Benefit Protection Act

SOF ¶ 18.

A plain reading of this language shows that it did no more than require that Brown not violate, among other things, state and federal anti-discrimination statutes, including the very laws on which Doe's discrimination claims are based.  As shown *infra*, Brown did not violate those laws and, as a result, did not breach the Discrimination and Harassment Policy.

> **a.  The Statements In The Discrimination And Harassment Policy On Which Doe Relies Merely Restate Brown's Preexisting Obligations Under Federal And State Law And Do Not Constitute An Enforceable Contract**

Summary judgment should enter for the separate reason that, because the relevant language imposes on Brown no obligation beyond its preexisting legal obligation not to violate federal and state discrimination laws, there can be no contract because there is no consideration. As stated in *Voccola v. Forte*, 139 A.3d 404, 414-15 (R.I. 2016), which addressed a preexisting obligation arising under contract:

> It is a basic principle of contract law that "[a] promise to carry out a preexisting contractual obligation owed to the promisee, or the performance of such a contractual duty, generally is not sufficient consideration; in such a case, the obligor is doing no more than he or she was already obliged to do and, thus, has sustained no detriment, nor has the other party to the contract gained any benefit." 17 C.J.S. Contracts § 153 at 535 (2011).

*See also In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980) (noting "well-settled rule in the field of contracts" that promise to perform a pre-existing legal duty that is neither doubtful nor subject to honest and reasonable dispute is not valid consideration where duty is owed to the promisor or the public at large).

61

While Brown is not aware of a case in the First Circuit addressing this issue in the educational context, other District Courts have rejected students' contract claims for lack of consideration where the alleged contract merely reaffirmed the school's preexisting legal obligations. For example, in *Stafford v. George Washington University*, the student-plaintiff asserted a claim for violation of Title VI of the Civil Rights Act of 1964 and sought to amend his complaint to assert breach of contract claims against the university based on, among other things, its Statement of Student Rights and Responsibilities, and its Equal Opportunity, Nondiscrimination, Anti-Harassment and Non-Retaliation Policy. 2019 U.S. Dist. LEXIS 241990, *6-*7 (D.D.C. Sept. 17, 2019). The court denied leave to amend, as it would be futile:

> The Court agrees with GWU that the … documents consist only of "promise[s] to perform … pre-existing legal obligation[s], [which] do[] not create mutuality of obligation and cannot give rise to an enforceable contract." GWU's Statement of Student Rights and Responsibilities merely declares that "the university will not permit *unlawful* discrimination on grounds of … race," while its Equal Opportunity Policy simply "affirm[s] the university's commitment to and compliance with," among other laws, "Title VI of the Civil Rights Act of 1964[.]" Nothing in either policy indicates that GWU intended to "promise[] to provide anything [to Stafford] more than it was already obligated to provide under Title VI."

*Id.* (alterations in original), and cases cited therein. Like the policies at issue in *Stafford*, Brown's Discrimination and Harassment Policy merely reiterates Brown's preexisting legal duties and cannot serve as the basis for Doe's breach of contract claim.

Similarly, in *Hoppe v. College of Notre Dame of Maryland*, a student brought claims under the ADA and Rehabilitation Act for failure to provide reasonable accommodations and a breach of contract claim based on an email she received from the school promising to provide an accommodation which, she claimed, the school failed to provide. 835 F. Supp. 2d 26, 27-28 (D. Md. 2011). The court granted summary judgment for the school, noting:

> A promise to perform a pre-existing legal obligation does not constitute consideration.

>Dr. Ferguson's October 10, 2006 e-mail reveals that it was provided in the context of meeting the College's pre-existing legal duty under the ADA and the Rehabilitation Act to reasonably accommodate Hoppe during her exams.

*Id.* at 35; *see also Di Lella v. Univ. of the Dist. of Columbia David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 11-12 (D.D.C. 2008) (dismissing breach of contract claim by student also asserting ADA, Rehabilitation Act, and District of Columbia anti-discrimination law claims, where contract claim was based on letter from dean promising accommodations allegedly not provided; the letter, "fairly read, promises and obligates the Law School to provide nothing more than … required … by law" which "cannot give rise to an enforceable contract"); *Doe v. Lees-Mcrae College*, 2021 U.S. Dist. LEXIS 54660, *21-*23 (D.N.C. Feb. 4, 2021) (in ADA and Rehabilitation Act case, dismissing student's breach of express and implied contract claims, as purported contractual promises to accommodate student merely restated preexisting legal duties).

These cases confirm that the statements Doe cites in Brown's Discrimination and Harassment Policy cannot form the basis of a breach of contract claim because the statements merely express Brown's preexisting obligations under federal and state law.

>**b. Other Statements In The Discrimination And Harassment Policy On Which Doe Relies Are Statements Of Aspiration Or Intent That Cannot Form An Enforceable Contract**

To the extent that statements in the Discrimination and Harassment Policy do not reflect Brown's preexisting duty to abide by federal and state discrimination laws, they are merely aspirational statements and statements of intent and desire that similarly cannot be the basis of an enforceable contract. *See, e.g., Minehan v. United States*, 75 Fed. Cl. 249, 260-61 (Ct. Fed. Cl. 2007) (aspirational statements and expressions of intention or desire do not create binding obligations), cited in *Jacobowitz v. YMCA of Greater Providence Bayside YMCA Branch*, 2016 U.S. Dist. LEXIS 42204, *10-*11 (D.R.I. Mar. 30, 2016) (Smith, J.); *see also G. v. Fay School*, 931 F.3d 1, 12-13 (1st Cir. 2019) (generalized aspirational statements and representations cannot

form the basis of a contract).[28]  Thus, statements that it is "incumbent on the university to create

and maintain an … environment that is free of any form of unlawful discrimination and

harassment," that "[u]nlawful discrimination and harassment cannot be tolerated," that members

of the Brown community "are entitled to live in an environment free from harassment," and the

like are statements of aspiration, intent, and desire which cannot form a contract.  By contrast,

the process that is due is set forth in the University's procedures.

### 2.  Brown Did Not Breach The Student Handbook

Doe's claim that Brown breached the Student Handbook fails for all of the reasons set out

*supra* and incorporated herein.  To summarize:

- The MCASP warned Doe during the 2017-2018 school year, and the 2017-2018 Student Handbook applied to the MCASP's actions taken during that time.  SOF ¶ 42.

- The 2017-2018 Student Handbook authorized the MCASP to consider professionalism issues documented in a PRF or "another evaluation that indicates unprofessional behavior," which includes the December 2015 and October 2016 reports of unprofessionalism.  SOF ¶ 13.

- The MCASP issued Doe's Professionalism Warning . SOF ¶¶ 13, 42.

- While the MCASP chose

---

[28] While the First Circuit in *Fay School* relied on Massachusetts law, Massachusetts law on interpretation of alleged academic contracts is identical to that of Rhode Island.  *Compare Fay Sch.*, 931 F.3d at 12 ("Massachusetts courts employ the 'standard of 'reasonable expectation,'' that is, 'what meaning the party making the representation … should reasonably expect the other party to give [the terms]'" (citations omitted)) *with Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 330 (D.R.I. 2016) ("Rhode Island courts interpret the terms of a student handbook 'in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them'" (citation omitted)).

████████████████████.  SOF ¶¶ 55, 60, 69, 111.

- Doe appealed her dismissal as provided in the 2018-2019 Student Handbook, and Dean Elias – rather than simply affirm the dismissal as he was entitled to do – asked the MCASP to reconsider the issue, which occurred at the MCASP's August 9, 2018 meeting, which Doe attended with her advocate and Dr. Weiss.  Dean Elias also met with Doe before deciding to affirm her dismissal.  SOF ¶¶ 117, 121, 124.

- Upon reconsideration, the MCASP, after carefully considering all the evidence before it, affirmed Doe's dismissal, and Dean Elias (whose decision was "final") affirmed the MCASP's decision, all as authorized by the 2018-2019 Student Handbook.  SOF ¶¶ 15, 131.

On these undisputed facts, Doe cannot show that Brown breached the Student Handbook.  This is especially true because

> the Rhode Island Supreme Court has cautioned that this student-school contract is unique and "does not require strict adherence to contract law."  A court should construe such a contract in a way that gives the school room to interpret and modify the contract in ways to best conduct its mission.  The First Circuit, applying Rhode Island law, determined that the student-school contract must be examined in accordance with a "reasonable expectations" standard.  The reasonable expectations standard requires that the contract be interpreted in line with the student's reasonable expectations.

*Driscoll*, 393 F. Supp. 3d at 157-58 (citations omitted).  Under this standard, even if Brown's actions did not strictly follow the Student Handbook's requirements – and, as described in detail above, they did – Doe still cannot prevail, because Brown's actions were at all times consistent with its mission to ensure that AMS graduates possess the essential skills and other qualities that the AMS, in its considered discretion, deems necessary to receive an AMS degree.  There is no evidence that Brown acted arbitrarily.  *See, e.g.*, *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 36 (1st Cir. 2007) (no breach of contract when no evidence establishes that university acted arbitrarily in carrying out procedures in handbook); *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016) (same).  Moreover, Doe cannot credibly argue that she reasonably interpreted the Student Handbook to condone her patently unprofessional conduct, poor judgment, and dishonesty where it clearly establishes that professionalism, good judgment, and integrity are

essential requirements to earn an AMS degree.  Finally, the AMS is entitled to deference in reaching its decision that Doe did not fulfill these essential requirements of the AMS program. As a result, summary judgment should enter on Doe's Student Handbook-based contract claim.

### G. The Undisputed Facts Show That Brown Did Not Breach The Covenant Of Good Faith And Fair Dealing

Doe claims that Brown breached the covenant of good faith and fair dealing by dismissing her in a manner that was arbitrary and unreasonable and thus violated guarantees of due process and fundamental fairness, but as explained above, the undisputed facts show that Brown's actions were based on Doe's documented instances of unprofessional conduct and complied with the Student Handbook's procedural and other requirements.  Thus, even assuming Doe was entitled to constitutional due process (which she was not), she plainly received it.  "The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary and unreasonable conduct."  *Doe v. Brown Univ.*, 209 F. Supp. 3d at 476, quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 329 (D.R.I. 1999), *aff'd* 217 F.3d 8 (1st Cir. 2000).  "Good faith and fair dealing cannot be separated from context, however – and in evaluating those covenants in the educational milieu, courts ***must*** afford a school some measure of deference." *Havlik*, 509 F.3d at 35.

The undisputed facts show that Doe's dismissal was not arbitrary or unreasonable; instead, it was firmly grounded in Doe's admitted unprofessional conduct and the procedures in the Student Handbook, and represented a careful and reasoned exercise of Brown's academic judgment in light of Doe's repeated failures to fulfill the AMS program's professionalism requirements, culminating in the "particularly egregious" instance of Doe's missed exam and lie. Doe can point to no facts supporting a finding that Brown acted arbitrarily or unreasonably.

66

To the extent Doe was entitled to due process – and she was not[29] – the undisputed facts show that Doe was provided notice of performance deficiencies and afforded multiple opportunities to correct her unprofessional behavior despite warnings that further unprofessionalism could lead to dismissal.  She was also provided the opportunity to be heard at the MCASP meetings concerning her unprofessional conduct: she appealed the dismissal decision, she made statements to and answered questions from the MCASP, submitted written materials to both the MCASP and (in appealing her dismissal) to Dean Elias (who also provided them to the MCASP), all as provided for in the Student Handbook.  *See, e.g.*, SOF ¶¶ 7, 52, 60, 106, 116, 121, 125, 128.  Even for public institutions, this was more than sufficient due process. *See, e.g., Horowitz*, 435 U.S. at 84-85 (where public university informed student of faculty's dissatisfaction with her clinical progress and the danger it posed to her continued enrollment and timely graduation, and dismissal decision was "careful and deliberate," student received "at least as much due process as the Fourteenth Amendment requires"); *see also Keefe v. Adams*, 840 F.3d 523, 534 (8th Cir. 2016); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1987); *see also Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 83 (1st Cir. 2018).

**H.  No Facts Support Doe's Claim For Intentional Infliction Of Emotional Distress**

Doe can point to no evidence sufficient to satisfy the rigorous legal standard applicable to her intentional infliction of emotional distress claim.  To avoid summary judgment, she must adduce evidence showing that Brown's conduct (1) was "extreme and outrageous," (2) was

---

[29] While due process may be required at public schools, it is not required at private educational institutions such as Brown.  *See, e.g., Boyle v. Brown Univ.*, 881 F. Supp. 747, 752 (D.R.I. Feb. 27, 1995) (Lovegreen, MJ.) (due process applies only to federal and state government actors, not private ones) and cases cited, *report and recommendation adopted* 881 F. Supp. 747 (D.R.I. 1995) (Boyle, J.), *aff'd* 70 F.3d 110 (1st Cir. 1995).  Moreover, even at public schools, due process is required only in connection with actions taken regarding ***misconduct***, and not where it involves ***academic*** concerns.  *See, e.g., Ayinkamiye v. R.I. College*, 2017 U.S. Dist. LEXIS 56033, *7-*8 (D.R.I. Feb. 22, 2017) (Sullivan, MJ.) (academic decisions "do not require a hearing as a matter of constitutional right.") and cases cited, *report and recommendation adopted* 2017 U.S. Dist. LEXIS 56028 (D.R.I. Apr. 12, 2017) (Smith, J.).

intended to cause her emotional distress or was in reckless disregard of the possibility of causing her emotional distress, and (3) was the cause of "severe" emotional distress. *Champlin v. Wash. Tr. Co. of Westerly*, 478 A.2d 985, 989 (R.I. 1984). Her evidence must show that Brown's conduct was "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004). She must also offer "some proof of medically established symptomatology[.]" *Shannahan v. Moreau*, 202 A.3d 217, 230 (R.I. 2019) and cases cited. Such evidence does not exist.

Doe alleged that Brown inflicted emotional distress by dismissing her, failing to provide reasonable accommodations, questioning her about her lying, and asking if she was involved with drugs. Cmpl. ¶ 96. But none of that conduct is extreme or outrageous or goes beyond all possible bounds of decency, and no evidence supports a finding that Brown, in committing those acts, either intended to inflict emotional distress or acted with reckless disregard of causing her emotional distress. While Doe may have experienced emotional distress in response to these actions, they were all based in fact and consistent with the Student Handbook. Doe: (1) was dismissed due to her repeated, admitted instances of unprofessionalism; (2) was afforded her requested accommodation; and (3) was questioned about dishonesty to which she readily admitted, and which she herself acknowledged was a "pattern" she engaged in "when faced with difficult events."

As for Dean White questioning Doe about ██████████████████████████ ████████████████████████████████████████████████████ and, regardless, once Doe denied it, Dean White accepted her denial, which ended the matter. SOF ¶ 139. None of this rises to the level of the kind of atrocious, utterly intolerable conduct that might

otherwise support her claim.  *See Doe v. Brown Univ.*, 209 F. Supp. 3d 460, 478 (D.R.I. 2016) (Court decides in the first instance whether conduct "could reasonably be regarded as so extreme and outrageous to result in liability;" granting Brown summary judgment because Brown's conduct in investigating and taking action against the student was neither sufficiently extreme nor outrageous); *Doe v. College of Wooster*, 243 F. Supp. 3d 875, 895-96 (N.D. Ohio 2017) (applying same legal standard and dismissing intentional infliction of emotional distress claim arising out of school's investigation of sexual assault allegation because investigation arose out of student's allegation of sexual assault and, as a result, conduct "fails to meet this demanding standard"); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994) (same, and noting that, because the school "substantially complied with its own procedures," conduct is not extreme or outrageous).  There is also no evidence from which a factfinder could conclude that Brown acted with intent to inflict emotional distress or in reckless disregard of the possibility of causing emotional distress.

At her deposition, Doe testified to a further alleged incident of intentional infliction of emotional distress, claiming that during her surgery rotation, another student told her that, while Doe was in the restroom, the "███████████████████████████████ ███████████████████████████████"'  SOF ¶ 140.  While Doe cannot point to any record evidence showing that this statement was made, even assuming that it is true, this alleged incident, like the others described above, simply cannot clear the high hurdle for such claims under Rhode Island law, as no reasonable factfinder could determine that this incident was atrocious, utterly intolerable, and beyond all bounds of decency, or that Brown acted with intent or in reckless disregard of causing emotional distress.

Finally, Doe cannot point to any proof of medically established symptomatology of her

distress beyond the distress she was already experiencing as a result of her mental health condition, and her claim fails.  *See Doe v. Brown Univ.*, 209 F. Supp. 3d at 478.

## V.      CONCLUSION

As shown above, Doe's repeated acts of unprofessionalism, poor judgment, and dishonesty rendered her, in the considered discretion of Dean Elias and the MCASP – who were best positioned to determine whether Doe should advance in the AMS program, clearly exercised the "professional judgment" required by *Ewing*, 474 U.S. at 225, and whose decisions are entitled to deference – unfit to receive the imprimatur of an AMS degree.  As Dean Elias testified:

> I had no problem with her taking a leave of absence to deal with ███████ issues. What I could not do was convince myself, or have anybody convince me, that her ██████ had anything to do with her dishonesty, and the lying that had been a repeated facet of her life and how she dealt with everybody, was going to be eliminated. I have a responsibility. When I train a student and put them out into the world, I have a responsibility of being comfortable that I'm training a quality physician who is honest and who has integrity, and will go out of their way to deal with the holy covenant that they have between doctor and patient. I could not get convinced that I could put the Brown seal of approval on this young lady, and send her out into the world as a physician.

SOF ¶ 152; *see also Chapman v. Meharry Med. Coll.*, 2022 U.S. App. LEXIS 16684, *5 (6th Cir. Jun. 15, 2022) (affirming summary judgment for medical school; courts "should only reluctantly intervene in academic decisions 'especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue [the] chosen profession'") *quoting Kaltenberger*, 162 F.3d at 437; *Al-Asbahi v. W. Va. Bd. of Governors*, 2017 U.S. Dist. LEXIS 12400, *35 (N.D.W. Va. Jan. 30, 2017) (granting summary judgment to school of pharmacology; school's instructors and administrators "[n]ot only … have an interest, they owe a duty to the public to ensure that … medical professionals are qualified, properly trained, and of the highest caliber") *citing Halpern*,

669 F.3d at 464.  Even setting aside Doe's well-documented history of unprofessionalism while at the AMS, her lie to Dr. Rougas, and acknowledgement that she engaged in a "pattern of lying," was particularly egregious and justified the affirmance of her dismissal.

For all the reasons stated above, summary judgment should enter for Brown on all of Doe's claims.

Defendant,

BROWN UNIVERSITY,

By its Attorneys,

/s/ *Joseph D. Whelan*
/s/ *Timothy K. Baldwin*
/s/ *Christopher N. Dawson*
Joseph D. Whelan (#5694)
Timothy K. Baldwin (#7889)
Christopher N. Dawson (#8508)
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite710
Providence, RI  02903
Tel: 401-270-4500
Fax: 401-270-3760
jwhelan@whelancorrente.com
tbaldwin@whelancorrente.com
cdawson@whelancorrente.com

Dated:  December 5, 2023

## STATEMENT PURSUANT TO LR Cv 7(c)

Pursuant to LR Cv 7(c), Brown University requests oral argument on this Motion for Summary Judgment, and estimates that between 45-60 minutes will be required.

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2023, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Timothy K. Baldwin*

00095951v4.DOCX