# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**JANE DOE**                                      :

*Plaintiff*,

**v.**                                            :

**BROWN UNIVERSITY**                              :

*Defendant*

## COMPLAINT
### INTRODUCTION

1.      Plaintiff Jane Doe brings this action against Brown University ("Brown") for discriminating against her on the basis of disability.  She seeks declaratory and injunctive relief under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, declaratory and injunctive relief and damages under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, declaratory and injunctive relief and damages under the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 *et. seq.*, and damages for intentional infliction of emotional distress, breach of contract, and breach of the implied covenant of good faith and fair dealing.

2.      Jane is 25 years old, and until June 2018 was a full-time medical student at Brown's Alpert Medical School.  In 2011, Brown accepted Jane into its Program in Liberal Medical Education, a prestigious eight-year program that combines an undergraduate education with medical school, and that has a 3.9% acceptance rate and students whose average SAT scores are in the top 10% of test takers.  While an undergraduate, Jane was diagnosed with depression and unspecified anxiety disorder, both of which she was able to manage without accommodations.

1

3.     Jane graduated from Brown's undergraduate program with a 4.0 GPA.

4.     When she began medical school at Brown, Jane began to experience symptoms of Attention Deficit Hyperactivity Disorder ("ADHD"), although she was not diagnosed with ADHD at the time.  These symptoms resulted in Jane receiving negative evaluations for professionalism even while she was meeting or exceeding expectations on her evaluations in all other categories.

5.     Because of actions caused by her undiagnosed ADHD, Jane was reported to the Medical Committee on Academic Standing and Professionalism ("MCASP") on four occasions. MCASP ultimately recommended that Jane be evaluated for ADHD.

6.     Jane underwent the recommended evaluation and was formally diagnosed with ADHD, and her doctors and learning specialist explained to Brown that the behaviors described in Jane's negative professionalism evaluations were symptoms of ADHD.

7.     Even after learning about Jane's disability, and that her behavior was related to this disability, Brown failed to provide Jane with reasonable accommodations and instead eventually expelled her.

8.     Jane was a medical student who showed great promise as a doctor.  By punishing Jane for having a disability, Brown not only deprived her of the opportunity to reach her full potential in the medical field, but also discriminated against her in violation of federal and state law.  Jane should be allowed to return to her previously successful studies at Brown, and also receive all other appropriate remedies to which she is entitled.

## THE PARTIES

9.     Plaintiff Jane Doe was a student at Brown from 2011-2018.  She has been diagnosed with major depressive disorder, unspecified anxiety disorder, and ADHD.  Jane has

2

physical and/or mental impairments that substantially limit one or more of her major life activities, including sleeping, eating, socializing, concentrating, time management, and understanding social cues. Jane qualifies as an individual with a disability entitled to the protections of the ADA and Section 504.

10.     Pursuant to Federal Rules of Civil Procedure 5.2 and 10, and Local Rule 102, Jane has simultaneously filed a Motion to Proceed Anonymously requesting that she be referred to as Jane Doe in all filings and that all information that could lead to her identification be redacted in all pleadings and documents in this lawsuit. Jane has requested anonymity because she is an individual with a mental health disability who alleges discrimination on the basis of her disability. The Complaint includes sensitive medical and educational information. Revealing Jane's identity in the public record could limit future employment and educational opportunities as well as unnecessarily expose Jane to stigma based upon her mental health disability. *Doe v. Blue Cross & Blue Shield of Rhode Island*, 794 F.Supp. 72, 74 (D.R.I. 1992) (explaining that plaintiffs may proceed anonymously in cases involving "abortion, mental illness, personal safety, homosexuality, transsexuality and illegitimate or abandoned children in welfare cases").

11.     Jane is currently a resident of Niagara Falls, New York and a citizen of the State of New York.

12.     Defendant Brown University is located in the State of Rhode Island and Providence Plantations, and is a Rhode Island non-profit corporation with a principal place of operation in Providence, Rhode Island.

13.     Brown is a public accommodation as defined in 42 U.S.C. § 12181(7) subject to the requirements of Title III of the ADA.

14.     Brown operates programs, services, and activities receiving federal funds, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act. *See* 29 U.S.C § 794.

15.     This action is brought for (1) declaratory and injunctive relief under the ADA, (2) declaratory and injunctive relief and damages under Section 504 of the Rehabilitation Act, (3) declaratory and injunctive relief and damages under RICRA, and (4) damages for intentional infliction of emotional distress, breach of contract, and breach of the implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over Jane's federal law claims arising under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 pursuant to 28 U.S.C.§ 1331.

17.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because these claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution."

18.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Jane and Brown are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.

19.     This Court has personal jurisdiction over Brown on the grounds that Brown is a citizen of the State of Rhode Island.

20.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because Brown conducts business in this district.

## FACTS

21.     Jane enrolled at Brown in 2011, where she was part of Brown's Program in Liberal Medical Education.  Students in this program are admitted as freshmen not only to the undergraduate program, but also to the medical school.  This program has only a 3.9% acceptance rate, and its students have SAT scores averaging in the top 10% of test takers.

22.     As an undergraduate, Jane became a leader on campus, serving as the Brown Lecture Board Co-President and the Ivy Film Festival Vice President of Business.  While in college, Jane was diagnosed with depression and unspecified anxiety disorder, both of which she was able to manage without accommodations.  Jane graduated Magna Cum Laude with a 4.0 GPA.

23.     In the fall of 2015, Jane enrolled as a medical student at Brown's Alpert Medical School.  As during her undergraduate years, Jane sought leadership roles on campus, including as an Alpert Medical School Student Ambassador, where she worked with the Biomedical Advancement Office to facilitate networking relationships between students and alumni, as well as to plan fundraisers and alumni events.  Jane also worked as a Genetics Laboratory Instructor, a research scientist for the Plastic Surgery Department, and a research scientist for the Infectious Disease Department.  Additionally, she was a research analyst for the Lifespan Cancer Institute from July 15, 2018 through September 6, 2018, where she designed and oversaw eight clinical studies.  Once she was no longer a student at Brown, Jane could not continue her work at

Lifespan. Lifespan told Jane, however, that she had an open offer to return if she was readmitted at Brown.

24.     Jane thrived academically in medical school. In her December 2015 evaluations, as a first-year medical student, she received "Excellent" ratings in all categories on her "Doctoring I Student Evaluation by Mentor," and was praised for showing respect for patients and staff, meeting learning goals, accepting feedback, and communicating effectively in the clinical environment. As Jane's mentor explained, "[Jane] is clearly beyond the level of her peers. She connects with patients easily."

25.     Jane also received "Meets Expectations Successfully" in seven of the eight categories on the "Doctoring I Student Evaluation by Small Group Leader." Her Small Group Leader made the constructive comment that Jane should work to improve her professionalism by "striv[ing] to find the appropriate balance between informality and professionalism" when interacting with patients.

26.     Subsequently, while in Doctoring II, Jane received perfect or near-perfect evaluations in all categories on each of her evaluations, and comments from her teachers reflected that she had shown enormous growth and had significantly improved her professional behavior.

27.     During Jane's second year of medical school, she received six out of nine "Meets Expectations Successfully" rankings on her October 27, 2016 "Doctoring III Mid-Term Student Evaluation." Of the three categories where Jane received a "Requires Additional Attention" ranking, two were for professionalism and one was for self-evaluation, with critiques that Jane was late to a meeting, seemed disorganized, and wore her hair in a messy bun, which was criticized as "distracting." Nevertheless, Jane was praised in faculty comments for "bring[ing] a

lot to our discussions and com[ing] prepared to talk about diverse topics," and for making "a lot of progress on [her] professional appearance over the last several weeks."

28.     In her subsequent "Doctoring III End of the Year Student Performance Evaluation" on December 8, 2016, Jane received nine out of nine grades of "Meets Expectations Successfully," as well as very positive open-ended comments in the professionalism category with no professionalism concerns noted. As the faculty comments elaborated, "[w]e appreciate your contributions in class and openness with the group. The quality of your case write-ups improved dramatically. Nice work . . . You definitely have the compassion and skills necessary to make a positive difference in the lives of your patients."

29.     Jane continued to succeed at Brown until she received her first "Professionalism Report Form" in November 2017 as a third-year medical student. The Brown University Medical Student Handbook explains that "[i]ssues of professionalism are documented via a brief reporting form ('The Professionalism Report Form')." Professionalism Report Forms may be filled out by faculty members or students who believe that Brown's professionalism policy has been violated.

30.     In the report, Dr. Vrees, a faculty member, notified Brown that she believed Jane had been unprofessional because Jane seemed disinterested in the orientation program, would intermittently close her eyes during the presentation, and interjected unnecessary side commentary. Dr. Vrees stated that Jane demonstrated "odd" behavior, including referencing her own medical history, arriving late, and yawning in close proximity to Dr. Vrees. Dr. Vrees also noted that Jane went missing for a portion of the orientation program and had failed to knock and introduce herself before entering a patient room.

31.     Under Brown's policies, "[f]irst reports of unprofessional behavior are submitted to the student's advisor with a copy to the Assistant Dean for Student Affairs." Pursuant to this policy, Jane met with her advisor about the Professionalism Report Form and wrote an apology letter as required.

32.     Shortly thereafter, on November 22, 2017, Jane received a "Professionalism Warning." This was surprising: Brown's policies state that if a student receives two or more Professionalism Report Forms, it will be considered a pattern of unprofessional behavior, and the student may receive a Professionalism Warning, but Jane had only received the one Professionalism Report Form from Dr. Vrees. The letter informing Jane she had received a Professionalism Warning referenced the professionalism comments made on Jane's December 2015 Doctoring I Student Evaluation and her December 2016 Doctoring III evaluation (neither of which had resulted in any formal reports or warnings at the time), but did not point to any formal reports of unprofessional behavior besides the Professionalism Report Form from Dr. Vrees. Nevertheless, Jane wrote an apology letter that was presented to MCASP.

33.     On January 23, 2018, Jane received a reminder email about her upcoming VA Medicine Clerkship that asked her to complete, no later than the following morning, an IT training that was required in order to begin the clerkship. Jane had been experiencing technical difficulties with the training, which impeded her ability to complete it in a timely fashion, and she e-mailed the VA on the morning of January 23 to request technical assistance. Jane completed the training the next afternoon by 1:50 p.m. Jane received a Professionalism Report Form from the VA Medicine Clerkship for tardiness in taking the training. Jane is aware of at least four other students who also failed to complete the training within the requested time frame, but as far as Jane knows, she is the only person who received a Professionalism Report Form for

tardiness with the training.  In fact, one of her classmates completed the training much later than Jane and, as a result, was unable to start the clerkship the same day as everyone else.  But unlike Jane, this student did not receive a Professionalism Report Form.

34.     As a result of this new Professionalism Report Form, Dr. Allan R. Tunkel, the Associate Dean, wrote to Jane on February 1, 2018 and asked her to appear at the February 15 MCASP meeting.  At the meeting, Jane was informed that MCASP would consider whether to issue her a more serious Professionalism Citation, or keep her on her current Professionalism Warning status.  Brown's policies allow a Professionalism Citation to be issued where a student has received a Professionalism Warning and then receives an additional Professionalism Report, or in "egregious" circumstances.

35.     On February 20, 2018, Jane received a letter from Dean Tunkel informing her that she was not being given a Professionalism Citation, but that any additional professionalism concerns would result in her being considered for a Professionalism Citation.

36.     Jordan White, the Assistant Dean of Student Affairs, was charged with helping Jane develop a remediation plan for her behaviors and recommended after Jane received the February 20, 2018 letter from Dean Tunkel that Jane be tested for ADHD.  Jane contacted Diane Green, a learning specialist at Brown, on March 5, 2018 to schedule a preliminary assessment.

37.     Throughout this time, Jane continued to succeed in almost all other aspects of her medical education.  Jane's March 9, 2018 "Surgery Clerkship Student Performance Evaluation" gave her "Meets Expectations" as an overall grade.  The faculty was positive about Jane's performance, with one resident stating that "she continued to improve as the clerkship progressed and this was evident in our discussions in the clinic/office hours with me.  [Jane] was an enthusiastic member of the team.  She sought opportunities to help."

38.     In the March 9, 2018 evaluation, however, Jane also received an "Inconsistent"—but not the lowest grade of "Rarely"—in the professionalism category.  One attending physician commented that Jane was tardy, and would occasionally bite her nails and sit in awkward positions (although the physician admitted that the latter two behaviors corrected themselves after the Christmas break without any feedback). Even this physician added that Jane was "bright, enthusiastic and a pleasure to work with."

39.     A resident also commented on Jane's March 9, 2018 evaluation that Jane wore unprofessional attire because Jane wore scrubs during a grand rounds presentation in which she discussed patients with approximately four people, all of whom were also wearing scrubs. Afterwards, the resident pulled Jane aside and told her that, as the presenter, she should have been wearing professional attire instead of scrubs, even though she was required to wear scrubs at all other times.  Jane replied that she had not known of this custom, but would wear professional attire thereafter.

40.     On March 12, 2018, Jane followed up on Dean White's recommendation that Jane be evaluated for ADHD and met with Diane Green for a preliminary assessment.  At the end of the meeting, Ms. Green told Jane that she was in shock that Jane had not been previously diagnosed with ADHD because it was like "they wrote the book on [her]" in terms of how closely her symptoms matched those of other adults with ADHD.  Having read the comments and reports regarding Jane's professionalism issues, Ms. Green remarked that she was also surprised Brown did not refer Jane to her sooner.  Ms. Green gave Jane a book to help her learn about her symptoms and how they differed from children with ADHD.  Ms. Green also connected Jane with Dr. Margaret A. DiCarlo, Ph.D, to set up a neuropsychological evaluation, and suggested that Jane request reasonable accommodations after receiving the evaluation.

10

41.     At its March 15, 2018 meeting, MCASP was made aware of the comments from
the person who graded Jane as "Inconsistent" in her Surgery Clerkship, even though no
Professionalism Report Form was ever filed.  In a letter dated March 19, 2018, MCASP
informed Janie that it would keep her on Professionalism Warning status and not issue a
Professionalism Citation.  MCASP also strongly encouraged Jane to be evaluated for ADHD
based upon a letter of support from Diane Green that was submitted at the meeting.

42.     Shortly thereafter, Jane received her April 2018 "Internal Medicine VAMC
Student Performance Evaluation."  She received an overall rating of "Exceeds Expectations," a
grade that only 15-20% of the class receives.

43.     Faculty comments on the April 2018 evaluation were glowing in their praise.  As
one faculty member explained:  "[Jane] is an incredibly super intelligent student with an
exceptional ability to learn things rather quickly . . . She is motivated about learning, takes
independent initiatives to learn and responds positively to constructive criticisms."  This same
faculty member further praised Jane's professional behavior, explaining that "[Jane] has some
personal characteristics that will serve her well as a physician.  She is very attentive to patients,
takes time to listen to them, responds to all their questions and addresses all their concerns . . .
She makes patients comfortable and at ease.  Her bedside manners and her attention to details of
the care of patients is one of her best assets as a clinician.  She was a pleasure to work with and I
am certain that she will be a good clinician".

44.     On May 1, 2018, Jane received an e-mail from Dean Jordan White stating "We
had a meeting scheduled this morning at 9a.m.  Can you please let me know what happened?"
Jane apologized and explained that she thought the meeting would not occur until after she had

the recommended neuropsychological evaluation.  The meeting was rescheduled for May 4, 2018.

45.     On May 2, 2018, Jane had the neuropsychological evaluation recommended by Dean White, Diane Green, MCASP, and Dean Tunkel.  She was evaluated by Dr. Margaret A. DiCarlo, Ph.D, who issued a report on May 5, 2018 finding that Jane's "clinical picture is consistent with a diagnosis of ADHD, Combined Type."  This report was provided to Jane and Diane Green that same day.  Dr. DiCarlo recommended that Jane take medication to treat the symptoms of her ADHD, continue to use organizational strategies, and seek out appropriate academic supports and accommodations.

46.     On May 3, 2018, as instructed by Dr. DiCarlo, Jane contacted her physician, Dr. Harold Woodcome, to obtain necessary medication.  Jane was able to see Dr. Woodcome and begin medication on May 10, 2018.

47.     On May 3, Dean White filed a Professionalism Report Form against Jane for missing the May 1, 2018 meeting.  Jane never received notice or a copy of this Professionalism Report Form and did not learn of it until the events surrounding the MCASP meeting on June 14, 2018 (see paragraph 61, below).

48.     On May 4, 2018, Dean White met with Jane regarding the neuropsychological evaluation.  They discussed the evaluation and the steps Jane was taking to begin medication.

49.     On May 8, 2018, Jane contacted Diane Green to find out how to request reasonable accommodations.  Ms. Green emailed Jane with the steps to be followed, which included an application, personal statement, and a letter in support of the requested accommodations from a "support mentor."  Ms. Green further noted that "it takes 2 to 3 months before [the Office of Student Affairs] repl[ies] to your accommodations request."

50.     Jane was scheduled to take her Step 1 Exam, often considered the most significant exam in medical school because of its impact on applications to residency programs, during the week of June 18-22, 2018.  Medical students typically study for three to six months for this eight-hour exam.  Jane determined that she would not have time before the exam to complete the actions Diane Green explained were necessary for requesting reasonable accommodations.  Jane consequently told Ms. Green she would formally request reasonable accommodations as soon as she finished her Step 1 Exam.

51.     On May 12, 2018, Jane met with Dean White at the latter's request.  During the meeting, Dean White suggested that because of Jane's ADHD diagnosis and symptoms, Jane should take time off from school.  Jane was taken aback by the suggestion because she had been doing well academically.  No other reasonable accommodations were offered or discussed.

52.     On May 16, 2018, Dean White wrote to Jane and again suggested she consider taking time off from school.  Although Jane initially replied that she wanted to finish her fourth year of medical school, the next day Jane wrote Dean White and agreed that taking a year off might be the best thing for her if she could be productive and conduct research while she was away.  Jane then met with Alex Morang, another advisor at the medical school.  Ms. Morang and Jane agreed that Jane should continue her medical school rotations through October 2018 so that she would have more time to conduct research and try out new rotations, and then take a year off between October 2018 and October 2019.

53.     During this time, Jane started taking the ADHD medication prescribed by Dr. Woodcome.  When the medication did not help, Dr. Woodcome instructed Jane to increase the dosage every few days.  By early June 2018, Jane had started to feel side effects from taking increasingly high dosages of the medication.  Jane was awake for multiple nights in a row, a

known side effect of the drug, and her depression and anxiety were triggered by the insomnia such that she began to experience the worst depressive episode of her life.  When Jane stopped taking the medication on or about June 4, she slept for 18 hours, though she continued to experience the depressive episode for a few more days.

54.     Before this depressive episode, Jane had self-scheduled her fourth year Objective Structured Clinical Examination ("OSCE") exam for June 5, 2018.  When this date fell right in the middle of her depressive episode and withdrawal from the ADHD medication, Jane missed the exam.

55.     Jane was scared about the times she had previously received negative grades and comments based on behavior she now knew was related to her disability.  She was also worried that if Brown knew about her depression in addition to her ADHD, they would try to force her out of school.  As a result, when Jane notified Dr. Stephen Rougas, her professor, that she had missed the self-scheduled exam, she told him it was because of a physical illness.  Jane ultimately took and passed the exam within the allowable designated two-month time period.

56.     After emerging from her depressive episode, Jane informed Dr. Rougas that she in fact missed her OSCE due to a depressive episode.  He told her he would have to report her to MCASP.

57.     In a June 8, 2018 email to Dean White, Jane wrote:  "As you may or may not have heard from Dr. Rougas, I had a pretty bad episode of depression this week that affected me worse than it has in a long time.  After lea[r]ning that I'd missed my OSCE, I reverted to my usual defense mechanism of making up a stupid excuse and pretending it wasn't because of the state of my mental health…."

14

58.     The next day, June 9, 2018, Diane Green, the Brown learning specialist who had previously recommended that Jane have a neuropsychological evaluation for ADHD, wrote to MCASP about how ADHD was affecting Jane.  Ms. Green told MCASP that the behaviors detailed in Jane's professionalism reports were symptoms related to her disability.  Ms. Green also told MCASP that "[i]n considering ADHD on a continuum, [Jane] falls into the outermost category of 'at risk,'" and that Jane was at the beginning of the treatment that followed her diagnosis.

59.     On June 12, 2018, Jane met with Dean White to prepare for the upcoming MCASP meeting about Jane's actions.  Despite having been informed by Diane Green that Jane had ADHD and that Jane's professionalism-related behaviors were directly related to her disability, Dean White did not discuss how this diagnosis could have affected her behavior or possible accommodations for Jane at this meeting.  Instead, Dean White recommended that Jane, in her letter to MCASP, take ownership of what happened, apologize, and explain her plan to take a year off.

60. On the morning of June 14, 2018, Dean White called Jane and shocked her by asking whether Jane's professionalism problems had actually occurred because she was selling or using cocaine.  This false and defamatory accusation was unsupported by any facts and, according to Dean White, was based on one faculty member's offhand comment to Dean White that she thought she may have overheard people at a restaurant say Jane's name in connection with cocaine use.  This faculty member admitted to Dean White that she was not positive it was Jane's name that she overheard.  Dean White told Jane on this phone call that using cocaine may explain Jane's behaviors.  Jane denied the allegations.  Dean White replied that because Jane denied using or dealing cocaine, MCASP would not discuss this issue at the meeting later that

day, but if Jane was ever ready to admit to it, Dean White was there for her. Jane told Dean White that it sounded like Dean White did not believe her and offered to provide a urine test and allow a search of her apartment. Dean White again said that she would take Jane's word for it, but that she was there if Jane was ever ready to admit selling or using cocaine.

60.    On June 14, 2018, MCASP met regarding the Professionalism Report Form filed by Dean White concerning the missed May 1, 2018 meeting and the Professionalism Report Form filed by Dr. Rougas concerning Jane's failure to take her self-scheduled exam on June 5 and her lack of candor for why she had missed the exam.

61.    MCASP also considered Diane Green's letter explaining that Jane's behavior was the result of her disability, and a letter Jane had given to Dean White describing in detail her struggle with major depression. In the letter, Jane requested that she be permitted to take a year off (as she had previously discussed with Dean White and Alex Morang) to learn about her disability and adjust to her medication, during which she planned to continue attending professionalism classes and classes for adults with ADHD to learn about strategies for managing symptoms that had started after her depressive episode.

62.    On June 14, 2018 MCASP voted to dismiss Jane from medical school. Dean White called Jane to inform her of this decision.

63.    On June 19, 2018, Dean Tunkel sent Jane a letter formally notifying her that MCASP had voted to dismiss her. According to the letter, "[t]he Committee had significant concerns about the fact that you were dishonest to a faculty member about your reason for missing the OSCE. At the meeting, the Committee reviewed all of the professionalism forms that had been filed about you, letters to you from me about previous actions of MCASP, and a review of your statement that included your explanations as to the previous and latest

professionalism issues. After careful deliberation, the Committee voted to dismiss you from the Alpert Medical School."

64.    Despite full knowledge of Jane's disabilities and an understanding that she had started taking new medication with uncertain side effects, and despite a letter from Diane Green stating that Jane's actions were symptoms of her disability, MCASP never spoke to her treatment professionals, including Diane Green, and did not discuss with Jane or recommend any possible reasonable accommodations that would allow Jane to continue her medical education, including Jane's suggestion that she take a year off to learn to manage her ADHD.

65.    MCASP did not discuss or recommend any plan of rehabilitation, treatment, leave of absence, or lesser censure for Jane before it decided to dismiss her. MCASP ignored the Brown policy stating that a Professionalism Citation—which Jane had never received—should typically be given prior to the more extreme step of dismissing a student from medical school. MCASP further failed to follow the policy requiring it to consider Jane's insights into her own health and willingness to seek help as elements of her professionalism.

66.    On June 22, 2018, Jane appealed her dismissal to Jack A. Elias, the Dean of Medicine and Biological Sciences and Senior Vice President of Health Affairs.

67.    Jane's appeal explained how ADHD affected her life, how she wanted to improve the behaviors that were deemed unprofessional, and explained her goals going forward. She detailed the steps she took after learning about her disability, and described how the effects of the new ADHD medication led to her missing the June 5 self-scheduled exam. Jane further apologized and took responsibility for where she could have made better choices, and she again proposed reasonable accommodations that would allow her to continue at Brown.

68.     Jane also attached to her appeal the note from Diane Green that had been submitted to MCASP prior to the June 14, 2018 meeting, along with new supporting documentation from her diagnosing doctor, Dr. DiCarlo, and her treating physician, Dr. Woodcome.  Dr. DiCarlo's submission included Jane's entire neuropsychological evaluation for ADHD and laid out her specific symptoms and behaviors.  Dr. DiCarlo also stated that she "reviewed the letter that Diane Green had written to the MCASP on June 12, 2018," and "concurred with the information, impressions, and recommendations therein."

69.     Dr. DiCarlo further explained "that it is apparent that [Jane's] clinical picture is complicated by the combination of ADHD and Major Depressive Disorder, with the need for more comprehensive treatment for both clinical disorders, the need for more time to determine the most effective medication regimen, and the need for more time for her to benefit significantly from treatment."  Dr. DiCarlo then recommended that Jane be granted the accommodation of taking one year off from school to pursue comprehensive treatment.

70.     Dr. Woodcome's letter to MCASP stated that he had diagnosed Jane with Major Depressive Disorder, Bulimia Nervosa, ADHD, and Unspecified Anxiety Disorder.  His letter also stated that Jane's "judgment was likely affected by her emotional decompensation and attendant insomnia."

71.     An MCASP meeting was held on August 9, 2018 to discuss Jane's appeal of her dismissal. Jane attended this meeting. An MCASP member asked Jane "How long have you been lying in your medical career and have you lied in the past to get away with things?" Additionally, this MCASP member asked, "Why did you think making up a detailed lie was a good idea?  How do we know you haven't done it in the past?  How do you know you won't do

it in the future?" After these questions, Dean Tunkel stated "You understand that mental illness isn't an excuse for lying. You agree with that, right?" Jane said that she did.

72.    On September 24, 2018, despite the additional evidence, Dr. Elias denied Jane's appeal and upheld her dismissal.

73.    Brown's actions, including its failure to provide Jane reasonable accommodations and/or make reasonable modifications to its policies and practices to avoid discriminating against Jane on the basis of her disability, violated the ADA, Section 504, and state law.

74.    Brown's treatment of Jane also violated its own professionalism policy, as well as its Discrimination and Harassment Policy. The Discrimination and Harassment Policy states that it is "incumbent on the university to create and maintain an educational, working, and living environment that is free of any form of unlawful discrimination and harassment." Unlawful discrimination is "defined by federal and/or state statutes...to include unfavorable or unfair treatment of a person or class of persons because of....disability..." Applicable statutes under the policy include Section 504 and the ADA.

75.    As a result of her dismissal, Jane's anxiety and depression have worsened. She has been extremely high achieving her whole life and has received regular positive feedback in academic settings, and Brown's dismissal has shattered her self-esteem. Jane now must see two therapists, in addition to her psychiatrist, to address her feelings about her dismissal from medical school and work on her behaviors that result from her ADHD.

76.    Jane has been unable to secure a job commensurate with her education and skills due to the dismissal. She has applied to over 40 jobs and tirelessly networked within healthcare-related fields. Unfortunately, during multiple interviews, employers have become uncomfortable when learning that Jane is taking time off from medical school. Indeed, employers express

surprise that Jane would take time off during her third year of medical school, with one prospective employer noting "you must have some clear mental health issues or something must be going on to make [you take time off]."

77.    Jane is also in extreme financial distress because her financial aid has ended, and she is now required to re-pay loans from medical school.

78.    This financial stress and inability to find a job has exacerbated Jane's anxiety and depression, affecting her ability to sleep and get through the day.  She is tired all the time and often cannot get out of bed.  She lacks energy and has become apathetic about everything.  After the dismissal, she regressed to some of her behaviors from her eating disorder that she previously resolved, such as binging and purging food.  She feels numb.  At night she gets caught in cyclical thoughts and rumination over her inability to move forward after the dismissal.

## FIRST CAUSE OF ACTION

### Violation of Title III of the ADA, 42 U.S.C. § 12182 et. seq.

79.    Jane repeats the allegations of the above paragraphs as if fully set forth herein.

80.    As described above, Brown's actions and practices—including expelling Jane from medical school without providing reasonable accommodations and/or making reasonable modifications for her disability—violate Title III of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12182 et seq.

81.    Brown's actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12182, in that Brown has discriminated against Jane on the basis of her disability with regard to the full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations.

82.     As described above, Brown also violated the ADA by failing to provide reasonable accommodations and/or make reasonable modifications that would enable Jane meaningful access to Brown's services, programs, or activities.

83.     As a result of Brown's violations of the ADA, Jane has been injured and damaged, as detailed above.

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

84.     Jane repeats the allegations of the above paragraphs as if fully set forth herein.

85.     As described above, Brown's actions and practices—including expelling Jane from medical school without providing reasonable accommodations and/or making reasonable modifications for her disability—violate Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794 et seq.  Brown is a covered entity for purposes of Section 504 because it operates a program or activity receiving federal funds.

86.     Brown's actions and practices described above discriminated against Jane, excluded her from participation in, and denied her the benefits of, Brown's programs, services, and activities because of her disability in violation of Section 504.

87.     As described above, Brown also violated Section 504 by failing to provide reasonable accommodations and/or make reasonable modifications that would enable Jane to have meaningful access to Brown's services, programs or activities.

88.     As a result of Brown's violations of Section 504, Jane was injured and damaged, as detailed above.

## THIRD CAUSE OF ACTION

### Violation of Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1

89.     Jane repeats the allegations of the above paragraphs as if fully set forth herein.

90.     Jane has a disability and is in a protected class under the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1.

91.     RICRA prohibits discrimination in "the making, performance, modification and termination of contracts….and the enjoyment of all benefits, terms, and conditions of the contractual and other relationships." R.I. Gen. Laws § 42-112-1(b).

92.     The Brown University Discrimination and Harassment Policy (2016) and the Brown University Medical Student Handbook afford Jane certain rights that are contractual in nature. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) ("A student's relationship to his university is based in contract…. The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook."); *Doe v. Brown Univ.*, 327 F.Supp.3d 397, 415 (D.R.I. 2018) (same).

93.     As described above, Brown's actions and practices constitute unlawful discrimination under RICRA, in that Brown has discriminated against Jane on the basis of her disability, including expelling her from medical school without providing reasonable accommodations and/or making reasonable modifications for her disability.

94.     As a result of Brown's violations of RICRA, Jane was injured and damaged, as detailed above.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress Under Rhode Island Law

95.     Jane repeats the allegations of all of the above paragraphs as if fully set forth herein.

96.     As described above, Brown's conduct -- including expelling Jane from medical school without providing reasonable accommodations and/or making reasonable modifications for her disability; being required to answer disrespectful and mocking questions about her mental illness; being told mental illness was not an excuse for lying; and asking her if she was a cocaine dealer and user, was intentional and reckless.  Brown's conduct was extreme, outrageous, and beyond the bounds of decency.

97.     Brown faculty members, employees, and officials knew or should have known how ADHD and new medications can affect behaviors.  Jane at all times took recommended actions to address issues that arose, including undergoing a neuropsychological evaluation at Brown's request, and sought treatment for her disability.  Yet even after being told by one of its own employees and by treating professionals that issues for which Jane had been cited were directly related to her disability, Brown declined to provide reasonable accommodations and/or make reasonable modifications and instead expelled Jane from medical school.

98.     As a direct and proximate result of Brown's actions in ending her medical career just before her fourth and final year of medical school, Jane has suffered and continues to suffer severe emotional distress, including increased anxiety and depression, an inability to sleep, regression into eating disorder behaviors, feeling numb and apathetic, and often being unable to get out of bed.

## FIFTH CAUSE OF ACTION

### Breach of Contract Under Rhode Island Law

99.    Jane repeats the allegations of all of the above paragraphs as if fully set forth herein.

100.    The Brown University Discrimination and Harassment Policy (2016) and the Brown University Medical Student Handbook afford Jane certain rights that are contractual in nature. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) ("A student's relationship to his university is based in contract…. The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook."); *Doe v. Brown Univ.*, 327 F.Supp.3d 397, 415 (D.R.I. 2018) (same).

101.    The Discrimination and Harassment Policy covers all Brown students, including medical students, while the Medical Student Handbook is specifically applicable to those attending the Alpert Medical School.

102.    Brown breached its contract with Jane by failing to provide an "educational, working, and living environment that is free from any form of unlawful discrimination and harassment."

103.    Brown breached its contract with Jane by failing to follow the procedures outlined in the Medical Student Handbook regarding Professionalism Warnings, Professionalism Citations, and dismissal.

104.    Brown's expulsion of Jane will preclude her from completing her medical school degree in a timely fashion or at all.

24

105.    As a direct and foreseeable consequence of these breaches, Jane has sustained damages.

## SIXTH CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing Under Rhode Island Law**

106.    Jane repeats the allegations of all of the above paragraphs as if fully set forth herein.

107.    The Brown University Discrimination and Harassment Policy (2016) and the Brown University Medical Student Handbook afford Jane certain rights that are contractual in nature. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) ("A student's relationship to his university is based in contract…. The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook."); *Doe v. Brown Univ.*, 327 F.Supp.3d 397, 415 (D.R.I. 2018) (same).

108.    Furthermore, "[u]nder Rhode Island law, contracts contain an implied duty of good faith and fair dealing. *Havlik v. Johnson & Wales Univ.*, 490 F.Supp.2d 250, 261 (D.R.I. 2007), aff'd 509 F.3d 25 (1st Cir. 2007). "The covenant is regarded as a promise by each contracting party to act in a manner consistent with purposes of the contract. *Cigar Masters Providence v. Omni Rhode Island, LLC*, C.A. No. 16–471–WES, 2017 WL 4081899, at * 9 (D.R.I. Sept. 14, 2017).

109.    Brown breached its contract with Jane by expelling her in a manner that was arbitrary and unreasonable.

110.    Brown's arbitrary and unreasonable actions breached the terms of the contract and the guarantees of due process and fundamental fairness.

111.    Brown's expulsion of Jane will preclude her from completing her medical school degree in a timely fashion or at all.

112.    As a direct and foreseeable consequence of these breaches, Jane has sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Jane Doe, requests that the Court enter judgment on her behalf on all counts and grant her the following relief:

a)   Declaratory judgment that Defendant's conduct violated Plaintiff's rights.  In particular, that the Court declare the actions of Defendant to be in violation of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12182 et seq; Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 et seq; and the Rhode Island Civil Rights Act,  R.I. Gen. Laws § 42-112-1 et seq; and that Defendant intentionally or recklessly inflicted emotional distress upon Plaintiff, breached its contract with Plaintiff, and breached the implied covenant of good faith and fair dealing with Plaintiff.

b)   Preliminary and permanent injunctive relief reinstating Plaintiff as a student at Brown;

c)   Permanent injunctive relief restraining and enjoining Defendant, its agents, employees, and successors from discriminating on the basis of disability against Plaintiff in violation of the aforementioned acts, and denying Plaintiff the opportunities and benefits afforded other medical school students;

d)   Compensatory and punitive damages to the extent allowed under each of the aforementioned Counts;

    e)  All damages entitled under law, plus attorneys' fees, litigation expenses, and

costs, and any other relief provided by law or that the Court shall deem just and

proper.

RESPECTFULLY SUBMITTED, this 26th day of February, 2019.

*/s/ Jeffrey B.Pine Esq.*

Jeffrey B. Pine Esq. (#2278)
Lynch & Pine
1 Park Row, 5th Floor
Providence, RI 02903
(401) 274-3306
jpine@lynchpine.com

*/s/ Maura Klugman Esq.*

Maura M. Klugman (N.Y. Bar No. 4695623) (*Pro Hac Vice* pending)
JUDGE DAVID L BAZELON CENTER FOR MENTAL HEALTH LAW
1101 15th Street NW, Suite 1212
Washington, D.C. 20005
(202) 467-5730
maurak@bazelon.org