# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

JANE DOE,                          :
    *Plaintiff,*                   :
                                   :
v.                                 :    C.A. No. 19-cv-00100-WES-PAS
                                   :
BROWN UNIVERSITY,                  :
    *Defendant.*                   :

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Doe's Objection attempts to sow confusion around the simple, undisputed facts and law entitling Brown to summary judgment: (i) Doe incurred a series of professionalism reports prior to disclosing her disability to Brown and requesting an accommodation; (ii) under settled law, her disability disclosure did not excuse her past misconduct even if caused by her disability; (iii) Brown **granted** the only timely accommodation Doe requested (on May 17, 2018), taking a year off starting in October or November 2018; (iv) after Doe disclosed her disability, she ███████ ██████████████████████████████████████; (v) **as Doe has now admitted, lying is not a symptom of her** ██████,[1] **and her** ████████████████████████████████; (vi) when Doe asked to take a year off starting immediately on July 17, 2018, she had already incurred all of her professionalism reports and the MCASP had voted once to dismiss her; and (vii) the MCASP and Dean Elias properly considered Doe's professionalism forms and non-disability-related dishonesty in reaching their deference-receiving decision to dismiss Doe from the AMS. On these simple facts and settled law, Brown is entitled to summary judgment.

As explained below, while Doe's Objection (ECF 71) concedes key facts supporting summary judgment for Brown and misstates other facts, it is most remarkable because in it, Doe

---

[1] *See* Plaintiff's Statement of Disputed Facts ("Doe's SODF") (ECF 73), ¶ 152: "***Jane is not arguing that lying is a symptom of*** ████**.**"

– perhaps seeking to avoid application of the *McDonnell Douglas* burden-shifting test –
***expressly waives her disparate treatment disability claims, leaving only her accommodation***
***claims under the ADA, Section 504, and the RICRA***. Obj. at 30, n.11 ("Jane does not assert a
disparate treatment claim."). But Doe also attempts to inject a ***new theory of liability*** – that
Brown discriminated against Doe based on "stereotypic assumptions" and "presumptions,
patronizing attitudes, fears, and stereotypes about individuals with disabilities" – a theory Doe
never previously disclosed. Settled law holds that this late-disclosed theory is waived; but even if
not, it fails because no evidence supports it. And because Doe has waived her disparate treatment
claims, to the extent she is permitted to assert this new theory, it goes only to Doe's
accommodation claims which, under the facts and law, are subject to summary judgment because
Brown engaged in an interactive process by exploring accommodations with Doe and granted
Doe's only timely-requested reasonable accommodation.

As further shown below, Doe in her Objection fails to establish a factual or legal basis on
which her contract and intentional infliction of emotional distress claims survive summary
judgment, and Brown should receive summary judgment on all of Doe's claims.

## I.    Doe Has Expressly Waived Her Disparate Treatment Disability Claims

Tucked away in footnote 11 of Doe's Objection, Doe casually notes that "Jane does not
assert a disparate treatment claim." Obj. at 30, n.11. Doe pleaded, argued, and testified at
deposition that she was asserting disparate treatment claims. Brown vehemently denied those
claims, and Doe has now waived them.

"A disability discrimination claim may be based on one of three theories of liability:
disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Payan v.
L.A. Comm. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (involving Title II and Section 504
claims) (citation and quotation marks omitted); *see also Nunes v. Mass. Dep't of Corr.*, 766 F.3d

136, 144 (1st Cir. 2014); *Isaacs v. Trs. of Dartmouth Coll.*, 2017 U.S. Dist. LEXIS 176519, *18

(D. Mass. Oct. 24, 2017) (Title II and Section 504 claims). Doe clearly asserts failure to

accommodate claims, but she had also asserted disparate treatment claims that she has now

waived. *See, e.g.,* 3/11/2020 Order (ECF 22) at 8 (denying Brown's Motion to Dismiss; "Jane

also plausibly ***pleaded that Brown treated her differently than other students***."), citing Cmplt.

(ECF 1), ¶ 32. As Doe has waived her disparate treatment claim and never asserted a disparate

impact claim (for which there is no supporting evidence), all that remains of her disability claims

(Counts I, II, and III) is her failure to accommodate claim.

## II.    Doe's New, Unpleaded Disability Discrimination Theory Of Liability, Revealed For The First Time In Her Summary Judgment Objection, Is Untimely And Waived, Has No Evidentiary Support, And Should Be Rejected By The Court

In her Objection, Doe reveals an entirely new, never-before disclosed theory of

discrimination – that Brown purportedly engaged in "stereotypic assumptions" and

"presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities" in

dismissing her – which Brown strongly denies. Obj. at 30. As explained below, settled law holds

that, where a party asserts a new theory of liability in response to summary judgment, it is too

late and the late-disclosed theory is waived. Regardless, there is no evidence or law that supports

Doe's new theory. It should be deemed waived or, alternatively, summary judgment should enter

for Brown.

In her Complaint, Doe pleaded discrimination claims arising out of alleged disparate

treatment by Brown (for which there is no evidence, *see* Mot. at 25)[2] based on Brown dismissing

---

[2] Doe alleged that "at least four other students who also failed to complete the [VA Medicine Clerkship computer] training within the requested time frame, but as far as Jane knows, ***she is the only person who received a [PRF] for*** ███████████," Cmplt. ¶ 33, but as noted in Brown's Motion, "the other student who ██████████████████████ also received a PRF," and there is no evidence of any other AMS student receiving treatment different from Doe in the record.

Doe despite knowing of her disability and that her prior misconduct may have been related to it. *See* Cmplt. ¶¶ 1, 22, 57-59, 61, 64, 67-70, 72. Nowhere in her Complaint does she allege Brown engaged in disability misconceptions and stereotypes. Doe's claims, as she pleaded them, thus alleged that she was treated differently than other students. Nothing in the Complaint even hints at claims based on misconceptions and stereotypes.

Brown moved to dismiss the Complaint, and in her MTD Objection (ECF 17), Doe again did not mention claims based on misconceptions and stereotypes; instead, Doe argued that she had sufficiently alleged claims of disparate treatment and failure to accommodate.[3] The Court recognized as much and, in denying dismissal, noted: "***Jane also plausibly pleaded that Brown treated her differently than other students***." MTD Order at 8. The Court's interpretation of Doe's claims was correct – Doe's discrimination claims were pleaded and argued as claims of disparate treatment and failure to accommodate.

Brown then formulated its case and discovery strategies based on Doe's as-pleaded and as-argued disparate treatment claims. Even at her deposition, Doe confirmed she was asserting a disparate treatment claim:

> Q. Do you believe that this is evidence that you were treated differently than other students?
>
> A. I do believe that once I was identified as someone who was, quote/unquote, a problem, ***I was put under a microscope that other students were not*** and I do not – ***and I do believe*** that, for example, if this counted for me as a second write-up, a second warning but didn't – didn't count for others as a primary warning, ***that there were different requirements for what counted as an official professionalism problem*** in that capacity, yeah, I do think that's wrong.
>
> Q. So you believe you were being treated differently than [another AMS student], and you believe that was because of your disability, correct?
>
> A. ***I believe that I was being treated differently from this [student]*** because Brown had

---

[3] *See* Obj. to MTD at 7 (arguing that Brown's cited law does not "allow an educational institution … to apply varying standards to different students"), 8 ("other students were not disciplined like Jane for similar or worse behavior"), 8-9 ( "at least one other student at Brown committed significantly more serious academic violations on multiple occasions and was not dismissed").

taken a very antagonistic outlook in treatment towards me. That would be why.

> Q. But ***aren't you trying to use him as a comparator to show that you were being treated differently than other students***?

> A. ***Yes***, in this particular situation.

8/17/2021 Dep. of Doe at 243:22-244:21. She also confirmed she claimed Brown dismissed her despite knowing of her disability and that it may have been related to some of her misconduct:

> Q. Okay. Now, do you believe – or is it your allegation that you were expelled from the medical school because of your disability?

> A. It is my belief that I was expelled from medical – that the reasons surrounding my professionalism concerns that led to my expulsion are acutely and directly tied to my disability, yes, and that the medical school was made well aware of that.

> Q. … What I'm trying to delineate is, is your claim that you were not provided with an accommodation or is it your claim that the medical school elected to expel you because you had a disability? I'm trying to understand the essence of your claim, in your own words.

> A. Well, my answer would be both.

> Q. Okay.

*Id.* at 82:9-83:4. Doe never testified that Brown engaged in misconceptions or stereotypes about her disability.

Brown also relied on Doe's Complaint, MTD argument, and deposition testimony – all consistent with her as-pleaded claims and inconsistent with her new theory – in the time-consuming and expensive task of researching and drafting its Motion for Summary Judgment and Statement of Undisputed Facts. The Motion comprehensively addresses Doe's as-alleged claims and shows that neither the facts nor the law support Doe's as-pleaded claims and Brown should receive summary judgment. Whether Doe belatedly asserted her new theory to avoid summary judgment or for some other reason, she has waived it.

It is settled that "[f]ederal pleading rules require the plaintiff to give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007). The First Circuit similarly notes that "[t]he ***fundamental purpose of our***

***pleading rules is to protect a defendant's inalienable right to know in advance the nature of the cause of action being asserted against him***. The complaint ***must*** provide this notice ***not with mere 'conclusions,' but rather with 'factual content'*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Martinez v. Petrenko*, 792 F.3d 173, 179 (1st Cir. 2015) (citations omitted). In the First Circuit (and in other Circuits),[4] Doe's new theory must be rejected because, by waiting until summary judgment to reveal it, she waived it.

"***Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment***.'" *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (citation omitted). The reasoning is simple: "Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled." *Id.*, citing *Martinez*, 792 F.3d at 179-80. That is what happened here.

While Doe is free to waive her disparate treatment theory of discrimination (which she has now done), the above-cited authorities make clear that she cannot replace it with a new theory of liability in opposition to summary judgment. Judge Smith recently invoked this settled rule in *Travers v. Cotiviti, LLC*, 2022 U.S. Dist. LEXIS 49394, *15 n.8 (D.R.I. Mar. 21, 2022),

---

[4] *See, e.g., Thomas v. Egan*, 1 Fed. Appx. 52, 54 (2nd Cir. 2001) ("it is inappropriate to raise new claims for the first time" on summary judgment); *Brown v. Phillips*, 2021 U.S. Dist. LEXIS 127961, *25-*26 (E.D. Pa. Jul. 9, 2021); *Harris v. Reston Hosp. Ctr., LLC*, 523 Fed. App'x 938, 946 (4th Cir. 2013) (affirming rejection of new legal theory asserted in summary judgment objection); *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) (claim first asserted in summary judgment objection "is not properly before the court"); *Goodson v. Bank of Am, N.A.*, 600 Fed. App'x 422, 427 (6th Cir. 2015) (allowing new claim asserted in summary judgment objection "would subject defendants to unfair surprise"); *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (new claim raised in summary judgment objection "waived"); *Ray v. State Farm Mut. Auto. Ins. Co.*, 2021 U.S. App. LEXIS 31707, *3 (9th Cir. 2021) (summary judgment is not a procedural second chance to flesh out inadequate pleadings); *Lifevantage Corp. v. Domingo*, 2016 U.S. Dist. LEXIS 189313, *56-*57 (D. Utah Sept. 22, 2016); *Jackson v. Haines City*, 2021 U.S. Dist. LEXIS 142357, *19 n.7 (M.D. Fla. July 30, 2021) (asserting new theory of recovery in summary judgment opposition is "too little, too late").

when he rejected a plaintiff's attempt to assert a new theory of age discrimination in opposition to summary judgment:

> Plaintiff's late-entered claim that the dynamics of this conversation amounted to retaliation ***must be disregarded, as both procedurally untimely*** and substantively meritless. ***A plaintiff may not suddenly bring a new claim in an opposition to a motion for summary judgment***, and here, the retaliation claim is absent from the Complaint and the Rule 16 filings. See Calvi v. Knox Cty., 470 F.3d 422, 431 (1st Cir. 2006) (holding that ***a plaintiff may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment."***

*Id.* at *15, n.8; *see also Saxena v. Univ. of Mass. Med. Sch.*, 2023 U.S. Dist. LEXIS 174690, *71 n.9 (D. Mass. Sept. 28, 2023) (in student's Title II and Section 504 suit against medical school for disability discrimination, rejecting plaintiff's effort to raise, at summary judgment, unpleaded "regarded as" theory of discrimination; because Plaintiff failed to plead it, "Plaintiff cannot proceed on this theory of liability against the Medical School").

In the nearly five years since Doe filed her Complaint (on February 27, 2019), Brown has relied on Doe's Complaint, her MTD argument, and her deposition testimony in devising its defenses and its litigation and discovery strategies, in conducting extensive and expensive discovery, and in preparing its detailed Motion for Summary Judgment.

Allowing Doe to proceed with her new theory of liability would prejudice Brown. Brown never considered or anticipated a possible claim that its personnel acted under misconceptions or stereotypes (they did not) regarding Doe's disability and, thus, did not pursue discovery concerning such a claim (***nor did Doe***)[5] or raise it in its Motion. Brown's efforts rightly focused on Doe's as-pleaded disparate treatment and accommodation theories. Doe had every opportunity to amend her Complaint or otherwise put Brown on notice of her new claim, but did not. If her new theory is allowed, the resources Brown has expended to date would be wasted,

---

[5] Doe cites no evidence to support her new claim of misconceptions and stereotypes, and none exists because the parties focused discovery on her as-pleaded disparate treatment and accommodation claims.

and Brown would be required to go to the time and expense of re-engaging in fact discovery, preparing a new summary judgment motion, and re-engaging its experts to address Doe's new and, as shown below, factually and legally baseless theory.

Doe's objection to summary judgment cannot serve as a surrogate for a properly amended complaint, yet that is what she seeks to do – assert unpleaded claims in her Objection. Doe should be held to the theories of liability she established in her operative pleading, then argued and testified to at deposition. Her new theory should be deemed waived.

### III. Even If Considered By The Court, Doe's Newly-Disclosed Discrimination Claim Fails Because No Evidence Or Law Supports It

Even if the Court considers Doe's newly-disclosed theory, summary judgment should enter for Brown for at least two reasons: (i) *there is no evidence that Brown engaged in misconceptions or stereotypes* regarding Doe's disability, and (ii) her new theory can only support the disparate treatment claim that Doe has now waived.

As established in Brown's Motion, *see, e.g.,* Mot. at 31-37, Brown knew that some of Doe's misconduct prior to May 17, 2018 (when she first disclosed her disability) may have been related to her disability, but because a later-disclosed disability does not excuse pre-disclosure misconduct even if related to the disability, Brown had the right to consider Doe's pre-disclosure misconduct in dismissing her. Regarding her ████████████████████████████████ ████████████, *Doe has now admitted that lying is not a symptom of* ████,[6] as Brown correctly understood at the time. Brown was thus fully aware of Doe's disability and its possible effect on her misconduct when it dismissed her, had considered all of the information that Doe provided to the MCASP and Dean Elias in connection with her MCASP dismissal hearings, and

---

[6] *See* Doe's SODF (ECF 73), ¶ 152 (admitting that "*Jane is not arguing that lying is a symptom of* ████").

at no time was under any misconceptions or stereotypes regarding Doe's disability. Absent supporting evidence, summary judgment should enter on Doe's late-disclosed theory of liability.

Summary judgment should enter for the separate reason that, having waived her disparate treatment claim (and not asserting a disparate impact claim), Doe's new theory is not cognizable under the ADA, Section 504, or RICRA except for her accommodation claims. *See Payan*, 11 F.4th at 738 (ADA and Section 504 claims arise out of disparate treatment or impact or failure to accommodate). Summary judgment should therefore enter for Brown to the extent Doe is deemed to assert a disparate treatment or impact claim arising out of (nonexistent) misconceptions and stereotypes.[7]

## IV.    Doe Fails To Contest Certain Facts And Misrepresents Others In Her Objection

Turning to the merits of the Motion vis-à-vis Doe's as-pleaded claims, Brown first notes that Doe fails to contest, and thus concedes, the following:

- That professionalism is an ***academic*** component of the AMS curriculum, and that Brown's ***academics-related*** decisions are entitled to judicial deference.[8]

- That an accommodation request seeking to excuse past misconduct is, in reality, a request for retroactive accommodation that does ***not*** excuse past misconduct, even if that misconduct is related to the disability. *See, e.g., Driscoll v. Bryant Univ.*, 393 F. Supp. 3d 153, 160 n.12 (D.R.I. 2019) (McConnell, CJ.) ("an academic institution can be expected to respond to what it knows"), quoting *Wynne*, 976 F.2d at 795; *see also* Mot. at 45-49.

---

[7] Doe's new claim is not clearly explained in her Objection, but it seems to be based on Doe's assertion that, after she disclosed her ▮▮▮ to Brown, Brown should have excused her past misconduct because it may have resulted from her ▮▮▮. *See, e.g.,* Mot. at 49, n.24 (quoting Doe's testimony, including that after she disclosed her ▮▮▮, "[n]othing was relooked at. No one went back and said, oh, my gosh, this – this explains it" and "they didn't ***take away*** any of the professionalism warnings"); Obj. at, *e.g.,* 12 ("Three experts agreed … that her past behaviors were directly linked to her ▮▮▮"). If that is the case, Doe's claim is not based on misconceptions and stereotypes; it is based on her belief that Brown should have excused her misconduct as an accommodation for her ▮▮▮. But the law is clear that disclosure of a disability does not excuse pre-disclosure misconduct. *See* Mot. at 47-48 (collecting cases).

[8] While Doe argues that Brown's decisions concerning her ▮▮▮ are not entitled to deference – an issue not raised in Brown's Motion – that is irrelevant to the issues before the Court.

- That her dishonesty – a central factor in the MCASP's decision to dismiss her from the AMS – is *not* a symptom of her disability. *See* Doe's SODF, ¶ 152 ("Jane is not arguing that lying is a symptom of ADHD").

- That, at the August 9, 2018 MCASP meeting (to reconsider Doe's dismissal), ***Doe's own advocate –*** ███████████, *who Doe now characterizes as an "expert,"* Obj. at 26 – ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████. Doe thus *admits* that both *she and her own advocate and expert told the MCASP that* ███████████████████████████. The MCASP members, all physicians, knew this was correct; lying is *not* a symptom of ██████, which Doe has now admitted. SODF ¶ 152.

- That she lacked the ability to act on the continuous feedback she received from her AMS instructors orally and in feedback forms and PRFs, resulting in no significant improvement in her professionalism shortcomings that continued even after she disclosed her ADHD diagnosis to Brown.

- That she had an ***extensive history of dishonesty*** that establishes her dishonest character, including the many documented instances listed at pages 47-51 of Brown's Motion.

These facts, and others discussed in Brown's Motion, establish that Doe cannot prevail at trial. Doe cannot dispute that (i) she incurred all of her PRFs, except the PRF for ██████, *prior to* disclosing her disability to Brown, (ii) under settled law, her misconduct prior to disclosing her disability is not excused by her disability *even if the disability caused the misconduct*, leaving that prior misconduct fully actionable by the MCASP and Dean Elias, (iii) Brown *granted Doe's only timely-requested accommodation*, requested on May 17, 2018, of taking a year off starting in October or November 2018, (iv) after her May 17, 2018 accommodation request, Doe incurred her final PRF for ███████████████████████████████████████████████████████████ ███████████████████████████████████████████, (v) lying is *not* related to Doe's disability, and Doe's disability disclosure and accommodation request did not excuse her ██████, (vi) the MCASP and Dean Elias had the right, in dismissing Doe, to consider Doe's pre-disability disclosure professionalism reports and her ██████, and (vii) Doe's July 17, 2018 request for a year off starting immediately did not excuse her prior misconduct and, even if granted, would not

have cured the issues that led the MCASP and Dean Elias to dismiss her. In other words, the MCASP acted on actionable instances of unprofessionalism, as well as Doe's ███, and in light of her many transgressions, properly voted to dismiss her, then to affirm the initial dismissal vote. And Dean Elias was similarly empowered, based on those same facts, to reject Doe's appeal and affirm the MCASP's dismissal decision.

Doe's Objection also includes multiple misstatements of fact:

- "As this Court previously held, Brown is due deference only if it actually took 'into account the extent to which reasonable accommodations [could] … satisfy the legitimate interests of both the school and the student' and Brown 'explored those alternatives.'" Obj. at 45, citing MTD Order at 7 (quoting *Wynne II*, 976 F.2d at 792). The Court's MTD Order *never says this*; the cited pages of the MTD Order discuss the "otherwise qualified" analysis. The Court has never stated that Brown is not entitled to deference unless it can show it explored accommodations (which it did), and no law supports Doe's assertion.

- "Brown officials have admitted that they did not even consider Jane's leave request during the appeal and dismissal process," citing Ex. 7 at 54:22-55:1 and Ex. 10 at 47:7-48:8. Obj. at 35. The cited exhibits do *not* support this. Exhibit 7 is MCASP Chair Dean Tunkel's testimony that he was *fully aware of Doe's requests to take a year off*, and Exhibit 10 is Dr. Elias' testimony that *he and the MCASP were fully aware of and considered Doe's late request to take a year off starting immediately, but rejected her belated attempt to excuse her misconduct*.

- "Brown's Motion asserts *without basis* that Brown explored alternatives to Jane's requested accommodation of leave," Obj. at 35, but Brown supported, with record citations, the fact that *both* Dean White and Dr. Morang-Jackson explored accommodation options with Doe. Brown cited *Doe's own testimony* that Brown never denied her an accommodation, and that, in March 2018 (two months before she first asked to take a year off, and before Doe even considered taking time off), Dean White urged Doe to take a year off starting immediately, after which Dr. Morang-Jackson and Doe met and, as Doe testified, "we discussed different options," after which Doe chose what "seemed like the best option" to her – a year off starting in October or November 2018. Mot. at 42-45.[9]

---

[9] Importantly, Doe rejected suggestions to take a year off starting immediately based on her own personal and professional considerations, not on anything Brown suggested to her. She testified: "I still wanted to do *not only what was* ███████████ *but also for my career*," and that "I didn't think about [taking a year off starting immediately]. *I wanted to match up with my fiancé and my friends* and that was it." Mot. at 44 (quoting Doe's deposition testimony). Doe even acknowledged, in her June 22, 2018 appeal letter to Dean Elias, that "given these hurdles and pressures [she faced], *why did I not take advice I was given by Dr. White to take a year off immediately rather than wait until November, thus reducing or eliminating any risk of my obtaining a professionalism citation*." ECF 47-14 at 46. Doe may regret

- Claiming that Brown did not "help [Doe] figure out next steps" for securing leave, citing BU 006031, but that email, between Dean White and Doe, shows that when Doe asked "[d]o you know what the next steps would be for me to do this," Dean White responded: "…I touched base with Alex [Morang-Jackson] and it looks like you have a meeting with her today. Please let me know if you want to chat after you speak with her…. Let me know what the two of you discuss, and then *I can help figure out next steps*." Brown did help her figure out next steps. *See also* Ex. O at 2 (Doe-created timeline: "May 16, 2018: Dean White emails to ask me to take a year off – I wants (sic) to finish year 4 … Late May: I meets (sic) w/ Alex Morang re taking time off – I discuss waiting until Oct., 2018").

- "Jane does not have and has never admitted to a 'pattern of lying'; quite the opposite." Obj. at 50. But Dr. Rougas' notes of his conversation with Doe show that she told him "this *pattern of lying* is something that she has fallen accustomed to doing," SOUF ¶¶ 97, 104. As Brown established in its Motion, see Mot. at 54-57 (multiple instances of Doe's dishonesty), Doe in fact has a history of dishonesty, and *Doe admitted as much to the MCASP*. Her letter for the MCASP's June 14, 2018 meeting admits that



- In Doe's June 14, 2018 email exchange with Dean White asking about Dean White's discussion with Doe's father concerning, among other things, Doe's ████████, Doe claims in her Objection that she "emailed Dr. White that she (Jane) had no history of being dishonest.███████████████████████ Obj. at 51. Not true. Doe wrote: ██████



Brown's Statement of Undisputed Facts ("SOUF") ¶ 112. Doe did not ask about dishonesty *prior to her lying to Dr. Rougas, as she claims*.████████████████████████████████ This was troubling, as Doe's claim that she had ████████████████████████████ was plainly false; *at that time, she had already lied to Dr. Rougas and the MCASP had already voted once to dismiss her based largely on her admitted dishonesty*. Moreover, Doe ███████████████████████████████████. Doe Dep. 81:17-23.

---

rejecting Dr. White's suggestion, but she cannot deny that Brown explored accommodation options with her and agreed to her request for a year off starting in October or November 2018, which neither erased her prior misconduct or excused her subsequent lying.

- Doe muddies the record by referring throughout her Objection to her request to take a leave of absence without clarifying that, between May 17 and July 17, 2018, her *only* requested accommodation was taking a year off starting in October or November 2018 (which Brown granted), and *it was only on July 17, 2018, after the MCASP had first voted to dismiss her and she appealed, that she first requested to take a year off starting immediately*. Doe's lack of clarification on this crucial point leaves the reader believing Doe requested a year off starting immediately from the start, but that is not true.

- "Though [Dr.] Morang-Jackson had advised against it, in May Jane was willing and had intended to start a leave immediately." Obj. at 37, citing Ex. 5 at 71:3-72:10 and Ex. 9 at 43:20-23. There is no evidence that Dr. Morang-Jackson advised Doe against starting her leave immediately; Brown repeatedly urged her to do so, but Doe refused. The cited testimony in Exhibit 5 is Doe testifying she met with Dr. Morang-Jackson and "we had discussed different options" for her time-off accommodation request; but as Doe admits, '█ ████████████████████████████████████████████████████████ ████████ but Doe (not anyone at Brown), due to personal and professional concerns, wanted to start her leave in October or November 2018. The cited testimony in Exhibit 9 similarly does not support Doe's claim, as that testimony – by Doe's then-fiancé (now husband) – reflects that, even when Doe asked in July 2018 to take time off ███████████ ████████████████████████████████████████████████████████

- "Jane did not request a 'retroactive' accommodation, as Brown claims." Obj. at 36. While the time off Doe requested was to start in the future, Doe's deposition testimony and as-pleaded discrimination claims make clear that she intended and expected that her █████ disclosure would excuse her past misconduct. *See, e.g.,* Mot. at 49, n.24 (Doe's testimony that after she disclosed her ███████, "[n]othing was relooked at. No one went back and said, oh, my gosh, this – this explains it" and "they didn't *take away* any of the professionalism warnings"); Obj. at, *e.g.,* 12 ("Three experts agreed … that her past behaviors were directly linked to her ██████"). While Doe tries, unconvincingly, to distinguish two of Brown's cited authorities for the settled proposition that an accommodation request does *not* excuse past misconduct – *Trahan v. Wayfair Me., LLC*, 957 F.3d 54 (1st Cir. 2020) and *Halpern v. Wake Forest Univ. Health Sciences*, 699 F.3d 454 (4th Cir. 2012)[10] – *Doe does not even*

---

[10] Doe claims *Trahan* is distinguishable, Obj. at 36, because in *Trahan*, the plaintiff did not disclose her disability until after she was dismissed, and her requested accommodations were deemed unreasonable and unworkable, but that is irrelevant to why Brown cites *Trahan* – simply to show another First Circuit court holding that an accommodation request cannot excuse past misconduct even if caused by the disability. As for *Halpern*, Obj. at 36-37, which is significantly similar to the facts in this case, Doe complains it involved a claim that past misconduct was related to a disability in a letter appealing the plaintiff's medical school dismissal, that the plaintiff "did not provide the school with 'a proper diagnosis,'" and the school made "significant efforts" to help the plaintiff, but that is again irrelevant to the legal principal that an accommodation request does not excuse past disability-related misconduct. Doe is also incorrect that the *Halpern* plaintiff never provided a proper diagnosis, as he did so in December 2007, after much of his disability-related misconduct had occurred, but *prior to his last two professionalism infractions, which occurred in October and November 2008 – nearly two years after the disclosure*. *Halpern*, 669 F.3d at 459. Despite disclosing his disability before the final two infractions

***attempt to distinguish the six other authorities, including two from the First Circuit, that similarly hold that an accommodation request does not excuse past misconduct***. Mot. at 47-48 (collecting cases). Doe cannot avoid the settled principle that disclosure of a disability does not excuse past misconduct, even if caused by the disability.

- Regarding Doe receiving a PRF  Obj. at 20. Setting aside that this statement demonstrates Doe's understanding that she had asserted a now-waived disparate treatment claim, the statement is patently misleading. The evidence Doe cites, Ex. L at BU 6340-41 (*see* ECF 60-12 at 68-70), is an email string that includes Dean White

[11]

## V.  Doe Does Not Contest That Brown's Academic Decisions Are Entitled To Judicial Deference

Regarding deference, Doe does not contest that professionalism is an academic component of the AMS curriculum, and that Brown's academics-related decisions are entitled to deference. Such an argument would have failed regardless. *See* Mot. at 6-13 (citing evidence and legal authorities in support). Doe instead sets up a strawman, asserting that Brown's ***disability***-related decisions are not entitled to deference – an issue not raised in and irrelevant to Brown's Motion. Her argument might be relevant to her newly-disclosed theory of discrimination based on misconceptions and stereotypes – where such misguided beliefs are rightly not entitled to deference – but she waived that claim and, regardless, no evidence or law supports it. The evidence is clear that the MCASP and the faculty members who interacted with Doe around the

---

that, combined with his past disability-related misconduct, caused the school to dismiss him, the Fourth Circuit affirmed the dismissal because there, as here, his disability and accommodation request did not excuse his past misconduct *or* subsequent two incidents of misconduct. That should be the result here.

[11] For two additional examples of Doe mischaracterizing the record, see Brown's Reply to Plaintiff's Statement of Undisputed Facts (being filed herewith) at paragraphs 225 and 226.

time of Doe's dismissal had all of the information Doe and her doctors provided and were fully aware of her disability and that it might be related to some of her misconduct. They rightly refused to excuse her prior misconduct or her subsequent lying, and correctly considered all of Doe's misconduct in dismissing her.

Brown respectfully directs the Court to pages 31-37 of its Motion, which shows, for the July 14, 2018 MCASP meeting: ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████ Doe cannot point to a shred of evidence of any discriminatory animus or motivation for the vote, as none exists.

Professionalism and honesty are unquestionably central components of the AMS academic curriculum, and because Brown's conduct was **not** "a substantial departure from accepted academic norms" and Brown exercised appropriate professional judgments, *see Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985), then so long as Brown's decisions did not "disguise truly discriminatory requirements," its decisions regarding these issues are entitled to judicial deference. *See, e.g., Halperin*, 669 F.3d at 462-63 (where professionalism is part of

medical school curriculum and school's decisions did not disguise discriminatory motive or animus, school's decisions concerning professionalism and other academic matters are entitled to "great respect[.]") As there is no evidence whatsoever of any discriminatory motive or animus by anyone at Brown, Brown is entitled to summary judgment.[12]

### VI.    The *McDonnell Douglas* Burden-Shifting Test Applies To All Of Doe's Discrimination Claims Except Her Accommodation Claim

Doe argues that the *McDonnell Douglas* burden-shifting test does not apply to any of her discrimination claims.[13] But the First Circuit has, to Brown's knowledge, only held that the test does not apply to reasonable accommodation claims, and has not held that it does not apply to other claims under the ADA, Section 504, and RICRA. *See* Mot. at 22-24 (citing cases applying *McDonnell Douglas* test to ADA and Section 504 claims). Indeed, last year, the District Court for the District of Massachusetts applied the *McDonnell Douglas* test to Title II and Section 504 disability discrimination claims asserted by a medical student against his school. *See Saxena v. Univ. of Mass. Med. Sch.*, 2023 U.S. Dist. LEXIS 174690, *76-*86 (D. Mass. Sept. 28, 2023).

Doe cites no First Circuit authority holding that burden-shifting does not apply to her non-accommodation claims (to the extent she has not waived such claims). The authority that Doe does cite for that proposition, *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372 (10th Cir. 1981), has, to Brown's knowledge, never been adopted by the First Circuit. As Doe has no direct

---

[12] Doe asserts that the cases Brown cites establishing judicial deference to a school's academic decisions are distinguishable because the schools in those cases had afforded the students "a number of dispensations and second chances," Obj. at 46-47, but that has nothing to do with whether schools' academic decisions are entitled to deference. The cited cases do not say what Doe claims – they do not premise deference on past dispensations and second chances – and Doe's baseless assertion should be rejected.

[13] Brown did not mistakenly assert that the *McDonnell Douglas* test applies in this case as Doe claims. Brown was focused on Doe's as-pleaded discrimination claims, and not on her then-undisclosed claims for which that test might not apply (since misconceptions and stereotypes about disability are not entitled to deference). Doe alleged disparate treatment, but failed to allege any direct evidence of discrimination, which is precisely the type of claim to which the *McDonnell Douglas* test applies.

evidence of discrimination, the Court should apply the *McDonnell Douglas* test to all of Doe's discrimination claims (to the extent not waived) except her accommodation claims. *See, e.g., Saxena*, 2023 U.S. Dist. LEXIS 174690 at *83-*84 (applying *McDonnell Douglas* where plaintiff offered indirect evidence of discrimination).[14]

## VII.    The Court Should Not Rely On The Report of Doe's Expert Dr. Victor Schwartz

Doe in her Objection relies extensively on the report of one of her experts, Dr. Victor Schwartz, which is Exhibit 1 to her Objection. The Court should not rely on Dr. Schwartz's report for at least two reasons: his opinions are irrelevant to the issues before the Court, and even if considered, his opinions suffer from multiple shortcomings explained below.

Dr. Schwartz's opinions are irrelevant to the issues before the Court, as he does nothing more than express his personal disagreement with certain decisions by the AMS faculty members and MCASP concerning Doe. The decisions with which he disagrees – including faculty's issuance of professionalism forms, Dean White's handling of Doe's repeated professionalism infractions, and the dismissal decisions by the MCASP and Dean Elias – are all academic decisions and Dr. Schwartz's disagreement with them cannot overcome the deference due to such decisions. Dr. Schwartz's opinions are irrelevant for the separate reason that even if he had been an MCASP member voting on Doe's dismissal, the result would have been the same, as the MCASP voted ***overwhelmingly*** to dismiss Doe, voting █ to dismiss her initially, then █ on her appeal. His vote would not have changed the outcome. His opinions on an accommodation are similarly irrelevant because, as explained in Brown's Motion, an accommodation request

---

[14] In *Pushkin* – which involved a medical school student with multiple sclerosis who alleged he was denied admission based on his disability – the court noted that the *McDonnell Douglas* test would apply in disparate treatment cases, and while it refused to utilize the *McDonnell Douglas* test, that case, unlike this case, involved overwhelming ***direct evidence*** that the medical school refused to admit the plaintiff ***based expressly on his disability***, rendering that test inapplicable. *Pushkin*, 658 F.2d at 1386-1391.

cannot, as a matter of law, excuse or negate prior misconduct.

Dr. Schwartz's opinions should be rejected for the separate reason that his opinions are not reliable, as they suffer from a lack of any identifiable, reliable methodology, a lack of sufficient facts and data, and the rendering of (incorrect) legal conclusions, including:



- Dr. Schwartz wrote that ███████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████ *See*
  Mot. at 12-18, reports for 11/2015, 10/2016, 11/1/2017, 2/27/2018, 3/12/2018 (████████),
  and for 2/2017, 2/14/2017, 2/27/2018, 5/3/2018, 6/5/2018 (████████████████)

- Dr. Schwartz wrote: ██████████████████████████████
  ████████████████████████████████████████████
  ███████████████████████████████ Obj. Ex. 1 at 13. Not true. *See*
  Mot. at 12-17 (████████████████████████████████, *see* reports for 11/2015,
  10/2016, 11/1/2017, 2/27/2018, 3/12/2018), (████████████
  ████████████████████████████████ *see* reports for 9/2015, 12/2015, 9/2017,
  11/14/2017), (████████████████████████████, *see* reports for 1/2017, 9/2017),
  (██████████████████████████████████████████, *see*
  reports for 2/2017, 2/14/2017, 2/27/2018, 5/3/2018, 6/5/2018).

- Regarding the incident where ████████████████████████████
  ████████████████ Dr. Schwartz wrote: ████████████
  Obj. Ex. 1, at 12. But that is exactly what the AMS did – raised the issue directly with her, then included it in a performance report. SOUF ¶¶ 65, 66.

- Dr. Schwartz wrote: ████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████ Obj. Ex. 1, at 17. ████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████. SOUF ¶¶ 80-83, 85-86.

- Dr. Schwartz wrote that, ████████████████████████
  ████████████████████████████████████████████
  Obj. Ex. 1, at 20. But Doe ████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████ SOUF ¶ 80 (Ex. L at BU006110). Of course,
  ████████████████████████████████████████████

- Dr. Schwartz wrote: "█████████████████████████████████████████

  █████████████████████████████████████████████████████

  ████████████████ Obj. Ex. 1, at 21. ████████████████

  ███████ SOUF ¶¶ 97, 104. █████████████████

  ████████████████████████████████ ), see Mot. at 54-57, establishing that Doe has ████
  ██████.

The foregoing is representative of the problems with Dr. Schwartz's report. He seemingly was not provided with all of the relevant documents and drew faulty conclusions based on an incomplete record. He even misstates the law to bolster Doe's misguided claim that the MCASP was bound to excuse her misconduct once it learned that her pre-disability disclosure misconduct may have been caused by her disability. *See* Obj. Ex. 1, at 21. That Doe paid someone who, *post facto*, disagrees with Brown's deference-receiving decisions should not alter the Court's resolution of Brown's Motion.[15]

## VIII.    Doe Raises No Genuine Issue Of Material Fact Regarding Her Contract Claims

Doe argues that her contract claims survive summary judgment, but fails to specify how they overcome Brown's contrary arguments and law. Doe again relies on the Court's MTD Order, but the Court noted that it found Doe's allegations sufficed "at this stage," meaning on dismissal, where the Court was required to accept her allegations to be true. Discovery has shown, however, that Doe's key allegations for all of her claims are not supported by the facts, and the Court's MTD Order is not a basis for denying Brown summary judgment on Doe's contract claims.

Doe then acknowledges that the Discrimination and Harassment Policy "explicitly

---

[15] If opinions like those of Dr. Schwartz are all that is required to intrude on a university's academic decisions, then no university is safe from such second-guessing (and years of litigation) whenever it dismisses a student on academic grounds.

references the ADA and Section 504," Obj. at 53, thus admitting, as Brown argued in its Motion, that Brown in the Discrimination and harassment Policy promised to abide by those (and other) anti-discrimination laws. As Brown is already required to do so, there is no consideration from Brown to support enforcement of the Discrimination and Harassment Policy. *See* Mot. at 54-57. While Doe argues that **she** provided consideration, Obj. at 55, that misses the point. Mutual consideration is required to form an enforceable contract, and Doe does not contest the fact that Brown provided none.

Doe also argues that there is no evidence that Brown dismissed Doe for the "particularly egregious" lying incident, but Doe again overstates the significance of the communications she received from Dean Elias – there is **no** requirement that such letters set out every single detail of the dismissal, *see* Mot. at 33. Regardless, it is undisputed that (i) the MCASP and Dean Elias were fully aware that it could dismiss Doe for a "particularly egregious" incident, (ii) the MCASP and Dean Elias were deeply concerned by ███████████████████████ ███████████████ (iii) Doe was told **in writing that any professionalism forms issued to her following her March 12, 2018 PRF could result in her dismissal**, and (iv) after she subsequently incurred the PRF ███████████████████████████ ████████████████████████████████████████████ ███████████. *See* Mot. at 30-37; SOUF ¶ 111. Their deference-receiving decisions should be affirmed.

The remainder of Doe's contract and covenant of good faith and fair dealing arguments are comprehensively addressed in Brown's Motion, *see* Mot. at 54-64. As Doe's arguments either fail to overcome or outright ignore the on-point authorities cited by Brown, Brown relies on its Motion and its arguments herein.

IX.    **Doe Raises No Genuine Issue Of Material Fact Regarding Her Intentional Infliction Of Emotional Distress Claim**

Doe in her Objection fails to overcome Brown's arguments establishing that Doe's intentional infliction of emotional distress ("IIED") claim is subject to summary judgment. Here, Doe ignores the Court's MTD Order, and for good reason: The Court noted that, even accepting all of Doe's IIED allegations as true, denying dismissal was "a close call[.]" MTD Order at 9. Now that fact discovery is complete, Doe's IIED claim is no longer a close call; it is clearly deficient and should be dismissed.

Doe fails to show how Brown's conduct possibly rises to the level of "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," as she must to avoid summary judgment. *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004). It clearly was not. Indeed, at deposition, Doe testified regarding the incident where a faculty member

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.[16] When asked at deposition what she would have done if she were an AMS faculty member and had information that a student ████████████████, Doe testified that she would "do an investigation," but when asked if her "investigation" would include asking the identified student about the information, Doe equivocated and deflected, refusing to admit that what Dean White did – ask the student directly – is ***exactly what Doe would have done in similar circumstances***.

Doe also fails to point to any "***physical*** symptomology" she suffered as a result of the

---

[16] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████

alleged IIED. Doe cites to her deposition testimony, but her testimony only concerns

█████████████████ *See* Obj. at 56 (citing Ex. 5 at 258:6-260:2). She also cites to medical

records, but none of those records ties any physical injury or harm to anything that Brown did or

did not do. In short, Doe fails to cite **evidence** that she suffered a physical injury as a result of

Brown's conduct. Summary judgment should enter for Brown on Doe's IIED claim.

### X.    Doe's Objection Seeks To Distract From The Simple Facts Entitling Brown To Summary Judgment On Doe's Discrimination Claims

Notwithstanding the extensive briefing on the Motion, including Doe's Objection –

which seems to confuse the issues rather than provide clarity – there remain straightforward facts

that establish that Doe is not entitled to a trial on her claims. Regarding Doe's failure to

accommodate claim – which appears to be her only remaining discrimination claim given her

waiver of her disparate treatment claims – it was Dean White who, in March 2018, first urged

Doe to take a year off starting immediately, but Doe said no for personal and professional

reasons. On May 17, 2018, Doe finally asked to take a year off, after which Dr. Morang-Jackson

promptly met with Doe and, as Doe testified, the two explored different options, after which

Doe, again for personal and professional reasons, requested a year off starting in October or

November 2018. Brown agreed to this accommodation, but Doe then ███████████████

███████████████████████ leading to her final PRF.

It was not until after the MCASP's initial dismissal vote that Doe appealed and also

requested, for the first time, a year off starting immediately. By then, it was too late; her

accommodation request did not erase her past unprofessionalism or cause her dishonesty, and

Brown properly considered that information in dismissing Doe. The MCASP rightly relied on

Doe's past unprofessionalism in dismissing her, and justifiably refused to grant Doe what

amounts to an accommodation to lie. Whether Brown agreed to her late-requested

accommodation is irrelevant, since granting her a year off starting on July 17, 2018 (as she requested) would not have altered the ongoing disciplinary process, in which MCASP had already voted once to dismiss Doe and her appeal was pending. Her dismissal was lawful, and summary judgment should enter for Brown.

As to any other discrimination claims that the Court finds Doe has not waived, Brown's Motion establishes that the undisputed evidence shows that Doe was dismissed due to unprofessionalism, ███████████████████████, the evidence of which is overwhelming. In contrast, there is no evidence whatsoever of impermissible discriminatory intent or animus (or of supposed misconceptions and stereotypes). The MCASP was legally entitled to consider all of Doe's professionalism reports incurred prior to disclosure of her disability, to consider her ████ because it was unrelated to her disability, and to consider her ██████████████ because she admitted it to the MCASP. Professionalism and honesty are core academic requirements of the AMS curriculum, and the decision to dismiss Doe for failing to fulfill the AMS's academic requirements is entitled to deference and should be affirmed.

**XI.    Conclusion**

An AMS degree means that the degree-holder is, in Brown's estimation, a competent physician capable of, among other things, handling the inevitable stress and pressure inherent in the practice of medicine with professionalism and honesty. Doe exhibited neither of these essential traits. Her misconduct (which occurred prior to disclosing her disability) established her lack of professionalism, and her lie to Dr. Rougas and admission to ███████████████ (all unrelated to her disability) established her lack of honesty, particularly in the difficult situations that are a hallmark of providing essential healthcare. The MCASP and Dean Elias, considering Doe's past and aware of all of the information that Doe provided to them, acted

within their authority and discretion in, for the MCASP, voting twice to dismiss Doe then meeting with Dean Elias to discuss her appeal, and for Dean Elias, and for Dean Elias, handling Doe's appeal. They recognized that Doe lacked professionalism and honesty, both essential requirements of the AMS, and determined she was not entitled to continue her pursuit of an AMS degree. That decision should be affirmed, as the material facts are not in dispute and all point towards a finding that Brown at all times acted lawfully and reasonably in determining that Doe should be dismissed from the AMS.

Critically important, there is no evidence of any discriminatory motive or animus on the part of the MCASP or Dean Elias (or, for that matter, anyone else at Brown). True, Brown was unwilling to lower the AMS's essential professionalism requirements, but lowering essential requirements is not a reasonable accommodation, *see* Mot. at 44-45, and Brown was not required to grant Doe an accommodation to lie. Absent direct evidence of discrimination, Doe cannot prove under *McDonnell Douglas* that Brown's non-discriminatory reasons for dismissing her were pretext to hide impermissible discriminatory motive or animus.[17] On the facts and law, Doe has failed to show that her as-pleaded discrimination claims, and her contract and IIED claims, raise a genuine issue of material fact. Summary judgment should enter for Brown.

*Signature page follows.*

---

[17] Indeed, even if *McDonnell Douglas* is not applied, Brown's evidence establishing that it dismissed Doe for dishonesty and professionalism issues, and that Brown explored accommodation options with Doe and granted Doe's only timely-requested accommodation, is not materially disputed and Brown should still be awarded summary judgment.

BROWN UNIVERSITY,
By its Attorneys,

/s/ *Joseph D. Whelan*
/s/ *Timothy K. Baldwin*
/s/ *Christopher N. Dawson*

Joseph D. Whelan (#5694)
Timothy K. Baldwin (#7889)
Christopher N. Dawson (#8508)
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite710
Providence, RI  02903
Tel: 401-270-4500
Fax: 401-270-3760
jwhelan@whelancorrente.com
tbaldwin@whelancorrente.com
cdawson@whelancorrente.com

Dated:  February 15, 2024

00098928v2.DOCX